Jesse F. McWILLIAMS,
Plaintiff-Appellant,

v.

TEXACO, INC., Defendant-Appellee.

No. 84–3451.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1986.

---

Henderson, Hanemann & Morris, Philip Henderson, Houma, La., for plaintiff-appellant.

Lemle, Kelleher, Kohlmeyer & Matthews, Edward F. Kohnke, IV, James R. Silverstein, New Orleans, La., for defendant-appellee.

Before CLARK, Chief Judge, BROWN and GEE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

In this appeal, a seaman complains of three errors in the trial of his Jones Act[1] negligence suit: (1) the submission of the case to the jury by a general, rather than a special verdict; (2) the improper grant of a directed verdict as to the rate at which he was entitled to receive maintenance; and, (3) the entry of a directed verdict against his claim for punitive damages for his employer's allegedly willful refusal to pay maintenance.

---

1. 42 U.S.C. § 688.

Although we reject as without merit the seaman's contentions regarding the form of the verdict and his entitlement to punitive damages, we hold that the trial court erred in limiting proof of the maintenance issue to only that evidence which related to the seaman's actual expenses during the maintenance-cure period. We therefore reverse and remand on that issue.

### A Sailor's Life for Me

Jesse McWilliams was a seaman for over thirty-five years. The last sixteen years of his seafaring life were spent exclusively aboard vessels owned by Texaco, Inc., primarily aboard the oil tanker S.S. TEXACO NEW JERSEY. Over the course of three years,[2] McWilliams was involved in a series of four mishaps that allegedly caused him injury. After the last of his accidents, McWilliams disembarked from the TEXACO NEW JERSEY and never again returned to sea. He alleged that the accidents resulted from Texaco's negligence, and filed suit seeking damages under the Jones Act and for unseaworthiness under the general maritime law.

At trial, McWilliams introduced evidence on the issue of his employer's liability, and also attempted to introduce evidence relating to his claim for maintenance. On the maintenance issue, however, the trial court permitted him to introduce only that evidence which related to the actual expenditures he incurred while convalescing in his hometown of Pineapple, Alabama. The court refused to allow proffered evidence as to the reasonable cost of living in that small town, and eventually entered a directed verdict which awarded the seaman maintenance at the contract rate of $8.00 per day. The judge also ruled that the seaman had failed to adduce the necessary proof in support of his claim for punitive damages

and, consequently, directed a verdict in favor of Texaco on that claim.

The case was submitted to the jury by a general charge with a special verdict. The jury answered two questions in the negative: (i) was plaintiff's employer, Texaco, Inc., negligent; and, (ii) was the vessel in question unseaworthy. McWilliams neither objected to that method of submission, nor requested a special issue verdict under F.R.Civ.P. 49(a). Thus, without being asked to differentiate among the several accidents,[3] the jury found that Texaco was not negligent. The trial judge entered judgment for the company on the question of liability and awarded McWilliams maintenance at the rate of $8 per day. This appeal followed.

### Around the World ...

■ McWilliams first contends that the submission of the case by a general charge calling for a verdict without special interrogatories was an abuse of discretion by the trial judge. The seaman had sought damages for injuries that arose from four separate incidents. He contends that the jury should have been required to answer separate sets of special interrogatories directed to each of the four incidents in order to determine the issues of Texaco's negligence and his damages. Submission of this case by general charge and the modified special verdict, he asserts, confused the jury and rendered its verdict more than ordinarily inscrutable upon appellate review.

The manner in which the case will be submitted to a jury rests within the sound discretion of the trial judge. Under F.R. Civ.P. 49(a), a judge may choose to submit an entire case by general charge with a special verdict. We have often encouraged the use of special interrogatories as a

---

2. The incidents that gave rise to McWilliams' complaint began in 1979 and ended in 1982. They included the following events:

    (1) August 1979: McWilliams fell while using a twister tool and injured his elbow;

    (2) May 1980: McWilliams lifted a large hose filled with water and sprained his back;

    (3) November 1980: Several muck buckets fell on McWilliams' shoulder as he shoveled rust out of a tank; and,

    (4) May 1982: McWilliams' back "slipped out" while he was lifting a pilot's ladder overboard.

3. *See* footnote 2 *supra.*

means both of clarifying jury verdicts,[4] and of requiring the jury to specify the ground of recovery upon which it relied in reaching its verdict.[5] We have emphasized that special interrogatories provide this court with a readily identifiable basis for appellate review of jury findings.[6]

The use of general interrogatories to probe disparate allegations of negligence, if properly objected to by a party, would in all likelihood meet with our decisive disapproval. With four separate (and probatively uncertain) incidents, and for similar trials in the future, the use of special interrogatories addressed separately to each incident would certainly be preferable. But we cannot fault the trial judge. McWilliams neither objected to the form of submission of his case, nor requested special interrogatories directed to each of the four incidents.

Ordinarily, the burden is on a party to request a significant special interrogatory from the trial judge. Federal Rule of Civil Procedure 49(a) speaks squarely to this issue. It provides several things. First, it requires the court to give essential instruction and explanation to the jury. It then goes on to state that if in doing so

> the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

F.R.Civ.P. 49(a). McWilliams has failed to preserve his objection as required by the rule. "[A]n objection to an interrogatory, or lack thereof, must be made prior to the retiring of the jury or the objection is waived." *Central Progressive Bank v. Fireman's Fund Ins. Co.,* 658 F.2d 377, 381 (5th Cir.1981) (emphasis added). Having failed to make such a request, McWilliams can now make no objection to the use of this verdict. His appeal on this point is thus without merit.

### On $8.00 a Day

The next port of call is maintenance. In the course of determining the amount of maintenance to which McWilliams was entitled, the trial court admitted evidence of McWilliams' actual expenses during his convalescence. It refused, however, to permit the introduction of any evidence relating to the reasonable cost of various living expenses in Pineapple, Alabama during that period. In fact, the District Court granted a directed verdict on the issue, instructing the jury that McWilliams was to be awarded maintenance at the rate of $8.00 per day.

We conclude that it was error for the trial court to so limit the proof, and to grant an instructed verdict on the issue. Thus, we remand to permit the District Court to receive further evidence which would bear on the trier's conclusion as to the rate at which McWilliams should have received maintenance.

■ Generally speaking, the purpose of an award of maintenance to a seaman during his recovery period flowing from an illness or injury received while in the service of a ship, is to provide him with food and lodging ashore similar to that which he received aboard the vessel.[7] The amount

---

4. *Moses v. Marathon Oil Co.,* 749 F.2d 262, 263 n. 3 (5th Cir.1985); *Guidry v. Kem Mfg. Co.,* 598 F.2d 402 (5th Cir.1979).

5. *Edwards v. Sears Roebuck & Co.,* 512 F.2d 276 (5th Cir.1976); *see also* Brown, *Special Verdicts: The Doubt Eliminator,* 44 F.R.D. 338 (1968).

6. *Baustimler v. Rankin,* 677 F.2d 1061, 1071 (5th Cir.1982); *see also, Central Progressive Bank v. Fireman's Fund Ins. Co.,* 658 F.2d 377 (5th Cir. 1981).

7. *Calmar Steamship Corp. v. Taylor,* 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993, 997, 1938 A.M.C. 341, 343 (1938); *Springborn v. American Commercial Barge Lines, Inc.,* 767 F.2d 89, 95 (5th Cir.1985). The duty is really of ancient origin; one of its first appearances was in the Laws of Oleron.

> If it happens that sickness seizes on any one of the mariners, while in the service of the ship, the master ought to set him ashore, to provide lodging and candlelight for him, and

and duration of maintenance to which a seaman is entitled within the limit of the rules is, therefore, usually a question of fact. *Caulfield v. AC & D Marine*, 633 F.2d 1129, 1132 (5th Cir.1981). This is inevitably the case, because the amount necessary to ensure that a seaman receives appropriate maintenance and cure will vary according to the nature of his injury, the recovery process, and the place in which he is required to convalesce.

Evidence of a seaman's actual expenses during his incapacity is certainly a relevant starting point in this fact-specific inquiry,[8] but it is not necessarily a sufficient finish line. Actual expenses do not always provide a satisfactory benchmark, because in many cases a seaman may not have sufficient funds to obtain the kind of maintenance which the law provides him. For want of means, he may spend very little, simply because he is unable to fend for himself. On the other hand, he may be compelled to seek maintenance in a port where the cost of obtaining shipboard equivalents is prohibitively high. In short, the amount a seaman actually expends may be insufficient to provide him "with so much as he had on shipboard in his health." [9]

■ What, then, is a trial court to consider in setting the level of maintenance? The cases teach that when the seaman is provided with care by others, the ship's master is relieved of his liability for the obligation. *Johnson v. United States*, 333 U.S. 46, 50, 68 S.Ct. 391, 394, 92 L.Ed. 468, 473, 1948 A.M.C. 218, 221 (1948). Similarly, "the seaman must present some evidence that he expended sums for food and

lodging ashore that was equivalent" to that provided on the vessel. *Springborn*, 767 F.2d at 95. The fact that a seaman is actually able to live on a pittance, however, does not limit him to that recovery, nor does it establish that he was provided with adequate living conditions during his recovery. Thus, the court should allow relevant evidence to determine whether the sums actually expended by the seaman were adequate to afford him substantial shipboard equivalents. If they were not, then the Court should hear evidence as to the reasonable cost for such services as lodging and food in the place where the seaman is recovering. This fact-specific inquiry will enable the Court to give full effect to the regard for seamen embodied in the doctrine of maintenance and cure.

*No Punishment of a Reasonable Party*

The final berth on McWilliams' appellate voyage is in the port of punitive damages. McWilliams contends that the trial court erred in directing a verdict that denied him recovery of punitive damages because of Texaco's willful, arbitrary failure to comply with its maintenance obligations until almost seven months after the occurrence of the final incident in which McWilliams was involved. Closer scrutiny of the record below, however, reveals that Texaco's actions were reasonable under the circumstances; they were not the calloused, recalcitrant actions for which punitive damages are ordinarily awarded.

Texaco employs over 1,500 unlicensed seamen aboard the vessels of its United States fleet. As a maritime employer, the company is obligated to pay maintenance to

also to spare him one of the ship-boys, or hire a woman to attend him, and likewise to afford him such diet as is usual in the ship; that is to say, so much as he had on shipboard in his health, and nothing more, unless it please the master to allow it him; and if he will have better diet, the master shall not be bound to provide it for him unless it be at the mariner's own cost and charges; and if the vessel be ready for her departure, she ought not to stay for the said sick party—but if he recover, he ought to have his full wages, deducting only such charges as the master has been at for

him. And if he dies, his wife or next kin shall have it. (Footnote omitted.)
Article VII of the Laws of Oleron *reprinted in* 30 F.Cas. at 1171, 1174 (1897).

**8.** *Springborn*, 767 F.2d at 95; *Curry v. Fluor Drilling Servs, Inc.*, 715 F.2d 893, 896 (5th Cir. 1983); *Caulfield*, 668 F.2d at 1132; *Brown v. Aggie & Millie, Inc.*, 485 F.2d 1293, 1296 (5th Cir.1973).

**9.** Article VII of the Laws of Oleron, *supra* note 7.

any seaman who becomes ill or injured while in the service of his ship. A problem, however, is that the seamen employed aboard Texaco vessels are hired out of the Seamen's Hall of the National Maritime Union. The company's workforce is, therefore, in a continuous state of flux, a circumstance which makes the task of identifying the persons to whom a maintenance obligation is owed administratively difficult and unwieldy. In response to this problem, Texaco has a policy which requires that all seamen who request maintenance provide the company with medical reports to document their claims.

The wisdom of the documentation policy is illustrated in this case. Over the course of his employment with Texaco, McWilliams developed a pattern of claimed injury that closely coincided with the proximity of the TEXACO NEW JERSEY to Long Beach Harbor and to his sister's residence in that coastal city. In several of the incidents in which he claimed he was injured, *see* note 2 *supra*, McWilliams obtained hardship leaves through the issuance of Master's Certificates.[10] These certificates authorized him to leave the ship to obtain medical treatment. After obtaining the treatment authorized, McWilliams would return home to Pineapple, where he exhibited a proclivity toward extended vacations that often left him returning to duty weeks after the expiration of his otherwise authorized leave. An objective observer of McWilliams' conduct might well have been suspicious of the circumstances surrounding his injuries, and might well have required substantial medical documentation before yielding the skepticism naturally engendered by this seaman's claims for maintenance.

The ovular[11] case in this Circuit on punitive damages is *Holmes v. J. Ray McDermott Co.*, 734 F.2d 1110 (5th Cir.1984). *Holmes* held that an employer will be liable for punitive damages for refusal to pay maintenance when its conduct is callous and recalcitrant,[12] arbitrary and capricious,[13] or willful, callous and persistent.[14]

■ Texaco's conduct simply does not meet the *Holmes* standard. The company's administrative policy that requires medical documentation of maintenance claims has been in effect for some time, and McWilliams was aware of the policy because he had received maintenance from the company before. The requirement that he comply with the policy was reiterated to McWilliams when he telephoned fleet headquarters to request maintenance in May of 1982. Yet, he provided no documentation in support of his claim until October of 1982—almost five months after he disembarked from the TEXACO NEW JERSEY in Long Beach, California. When Texaco received the requested documentation, it commenced maintenance payments shortly thereafter.

■ While it is true that an employer's "laxness in investigating a claim that would have been found to have merit" can meet the *Holmes* test, 734 F.2d at 118, the evidence did not show that Texaco's actions were either lax or recalcitrant. Where doubt exists—as it reasonably did here—a vessel owner may request reasonable documentation from a seaman before it commences payment of maintenance that may prove both lengthy and expensive. Texaco

---

10. Claims of injury, however, were not the only occasions upon which McWilliams obtained hardship leave. He once obtained leave by asserting that he had fallen victim to "Christmasitis."

11. In this day and time of strict gender neutrality, it seems only fair—in the interest of equality, not of deference—to use a word other than the war-weary, worn-out "seminal." *See United States v. LeMaire*, 712 F.2d 944, 946 n. 1 (5th Cir.1983), *quoting Medavoi v. American Sav. &*

*Loan*, 89 Cal.App.3d 244, 152 Cal.Rptr. 572, 583 n. 1 (1979).

12. *Citing Vaughan v. Atkinson*, 369 U.S. 527, 531–32, 82 S.Ct. 997, 1000, 8 L.Ed.2d 88, 92 (1962).

13. *Citing Richard v. Bauer Drilling Co.*, 433 F.2d 954, 955 (5th Cir.1970).

14. *Citing Solet v. M/V CAPTAIN H.V. DUFRENE*, 303 F.Supp. 980, 989 (E.D.La.1969).

**520**

merely requested information that was necessary to determine the veracity of McWilliams' claim. When it was eventually provided with the information, the company evaluated it and began maintenance payments shortly thereafter. The record is simply devoid of the kind of arbitrary and calloused conduct necessary to trigger liability for punitive damages. Thus, we affirm the entry of a directed verdict in favor of Texaco on the issue, and so chart a course homeward.

*End of the Voyage*

The entry of a directed verdict against McWilliams on his claim for punitive damages is affirmed. Similarly, the District Court did not err when, without objection or request for a specific separate submission, it submitted broadly the question of Texaco's negligence to the jury. It was, however, error for the court below to limit the proof of McWilliams' entitlement to maintenance to only those expenses that the seaman actually incurred. Thus, the entry of a directed verdict on that issue is reversed and the case is remanded to the District Court for proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.