743 So.2d 780 (1999)
Calvin CRANE
v.
DIAMOND OFFSHORE DRILLING, INC.
No. 99-CA-166.
Court of Appeal of Louisiana, Fifth Circuit.
September 15, 1999.
*783 Lawrence D. Wiedemann, John H. Denenea, Jr., New Orleans, Louisiana, Attorneys for Appellee.
Richard A. Chopin, John S. Bair, Metairie, Louisiana, Robert Grant, Nelson Wagar, Gretna, Louisiana, Attorneys for Appellant.
Panel composed of Judges H. CHARLES GAUDIN, CHARLES GRISBAUM, Jr. and MARION F. EDWARDS.
EDWARDS, Judge.
Defendants Diamond Offshore Management Company and Diamond Offshore United Kingdom ("Diamond") appeal a judgment of the district court in favor of plaintiff Calvin Crane. For the reasons to follow we affirm the judgment of the trial court, except with regard to the imposition of pre-judgment interest on this maritime case.
Crane was a derrick man employed by Diamond and working aboard the OCEAN ALLIANCE. On March 17, 1994, Crane averred that he was "tailing pipe" (guiding pipe hanging in the derrick into the pipe-rack for storage). He normally worked in the derrick, but on the day in question he was called into the pump room to assist with tailing the pipe, a job which he had performed before. There were two roughnecks on the floor at the time, Philip Johnson and Wayne Culliford. After plaintiff arrived Johnson was called away. Three hands were normally employed for this job. On a mechanical rig, the floor is larger than on a non-mechanical one, so there is a greater distance that the pipe must be moved. Once the three strands of pipe are out of the rotary, the hands put the slips in to keep the pipe in place. According to plaintiff,
"... the driller would slack off the pipe to let the pipe rest on the slip so the slips are holding the weight of the pipe. One of the hands will drive the iron roughneck forward, break it, spin it out. He'll drive it back. When he gets clear, the driller will pick the pipe up and then the other two floor hands will shove the pipe over into the pipe rack."
If the pipe is full of mud, a five foot long collar known as a mud bucket is used. The driller picks up the pipe and lets the mud drain into the bucket and out of an attached hose. It takes two men to put the bucket on while the third man rolls the iron roughneck out of the way. Once the bucket is finished, two men grab the hanging pipe while the third man gets the bucket and hose out of the way. A slug is heavier weighted mud pumped into a drill pipe that causes the mud in the pipe to fall down a string as the pipe is pulled out of the hole, eliminating the need for a mud bucket. In this case, the plug was apparently inadequate and the string was wet, necessitating the bucket.
At the time of the accident there was mud on the rig floor and Crane braced his foot against the iron roughneck track, pushing an 1800 pound strand of pipe. Culliford testified that he tripped over the hose attached to the mud bucket. At some point during the process the pipe strand whipped back on plaintiff, "crunching" him up. When plaintiff tried to stand up, his back was hurting.
He worked the next day, went home and began seeking medical attention. He consulted several doctors who diagnosed a lumbar strain or sprain. However, plaintiff received no major relief to his back pain until he saw Dr. John Watermeier. Dr. Watermeier performed surgery, following which surgery plaintiff's symptoms improved vastly.
Plaintiff filed suit against defendants under the Jones Act and general maritime law. Following trial, the court found Jones Act negligence on the part of Diamond and found the vessel OCEAN ALLIANCE, upon which plaintiff was a crew member, to be unseaworthy. No negligence on the part of plaintiff was found. The judgment awarded plaintiff $799,255.00 in damages, broken down as follows: *784 $150,000.00 for past and future physical pain and suffering, past and future mental anguish, and physical disability; $149,470.00 in past lost wages; $453, 923.00 for future loss of income and fringe benefits; and $45,862.00 in past medical expenses. Pre-judgment interest was granted on the entire judgment from the date of judicial demand.

JONES ACT
Defendant contends that the trial court applied the pre-Gautreaux standard of care in ruling that it was negligent under the Jones Act, and in allocating no fault to the plaintiff for bracing his foot while manually tailing the pipe. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331 (5th Cir. 1997), held that a Jones Act seaman is required to act as a reasonable seaman under like circumstances and that a Jones Act employer is required to act as a reasonable employer under like circumstances. See Vendetto v. Sonat Offshore Drilling Co., 97-3103 (La.1/20/99), 725 So.2d 474.
In the revised reasons for judgment, the court made the following specific findings of fact:
Calvin Crane was a Jones Act seaman at the time of the accident on March 17, 1994;
Defendant, Diamond Offshore Management Inc., was the Jones Act employer of plaintiff on March 17, 1994;
Diamond Offshore, U.K. was the owner of the OCEAN ALLIANCE at the time of the accident on March 17, 1994;
Plaintiff was acting in the course and scope of his employment with Diamond Offshore Management, Inc. at the time of his accident on March 17, 1994;
Plaintiff was performing tasks in furtherance of the basic purpose of the vessel at the time of the accident on March 17, 1994;
Plaintiff was injured in an accident on the OCEAN ALLIANCE on March 17, 1994, at approximately 0200 hours, while manually pushing 5 inch drill pipe In a racking operation on the drill floor of the OCEAN ALLIANCE;
The lower racking arm on the OCEAN ALLIANCE was negligently broken by Steve Boone (Blue) on, or about, March 16, 1994;
The lower racking arm was reparable with parts aboard the OCEAN ALLIANCE between the time of its breakage and the time of the accident, within thirty (30) minutes to an hour;
The OCEAN ALLIANCE on March 17, 1994, was a totally mechanical rig when operational, thereby eliminating manual contact with drill pipe when tripping in or out of the hole;
The upper racking arm in the derrick was operated by an identical control system as the lower racking arm negligently damaged by Steve Boone (Blue) on, or about, March 16, 1994;
The driller, George Mackenzie, [sic] negligently allowed Steve Boone (Blue) to go into the derrick to operate the upper racking arm knowing that he was inexperienced and had negligently rendered the lower racking arm inoperable on the preceding day;
George Mackenzie, [sic] the driller, knew that Steve Boone (Blue) was not a derrick hand on the OCEAN ALLIANCE and knew that Crane should have been in the derrick on March 17, 1994 instead of the incompetent Steve Boone (Blue);
An employee of Diamond Offshore Management, Inc. pumped an inadequate slug into the well, thereby requiring the floor hands to pull a wet string instead of a dry string;
George Mackenzie, [sic] the driller, negligently sent Phillip Johnson, the third rough neck on the drill floor, to perform another job, thereby reducing the crew below the normal and acceptable compliment;
The plaintiff, and Wayne Culliford, were required to use a mud bucket because *785 of the deficient slug put into the well by an employee of Diamond Offshore Management, Inc.;
The absence of the third floor hand left no one to remove the mud bucket or the mud bucket hose from the path of the two remaining floor hands, who were required to push the drill pipe to its stacking position on the rig floor;
The driller, George Mackenzie, [sic] was in voice and visual contact with the floor hands, but failed to warn them of the tripping hazard, and failed to have the tripping hazard removed from the rig floor, precipitated by the absence of the required third floor hand;
Wayne Culliford tripped over the mud bucket hose and fell to the rig floor, thereby shifting the entire weight of the 5-inch drill pipe to plaintiff;
The drill pipe whipped back as a consequence of Culliford's failing, or the deficient operation of the upper racking arm by Boone, or a combination of both;
The aforesaid accident would have been incapable of occurring if the OCEAN ALLIANCE had been capable of total mechanical function, as it was designed;
Under the circumstances, the tripping of pipe in a partial mechanical and partial manual mode created a hazardous work environment for Crane and his fellow worker;
The deposition testimony of George Mackenzie, [sic] the driller, in the employ of Diamond Offshore Management, Inc., was noticed by defendants, and canceled without explanation;
George Mackenzie [sic] was under the control of the defendant, Diamond Offshore Management Inc.;
Calvin Crane was in excellent health and had no physical problems prior to the accident. However, following the accident, he had continuous and unrelenting problems with his back leading up to the surgery performed by Dr. John J. Watermeier, on the 21st day of September 1995. Prior to the injury of March 17, 1994, Calvin Crane maintained an average of $44,37.38 in gross income while employed with Diamond Offshore Management, Inc., and fringes;
Prior to the injury of March 17, 1994, Diamond Offshore Management, Inc. provided to Calvin Crane fringe benefits, including meals valued at 16:50(sic) per day; medical insurance valued at $3,338.40 per annum; life insurance premiums valued at $141.48 per annum and matching funds of 401 K plan at 3.75% of his gross wages, discounted to present value of $33,868.00.
In February of 1998, Calvin Crane returned to consistent employment, earning $1,500.00 per month in gross income without any fringe benefits.
That Calvin Crane has met the burden of proof required of him as to the causation of his injuries, regardless of whether the standard is "slight" or "reasonable prudence", that his injuries were caused by the negligence of his employer, Diamond Offshore Management, Inc., and the unseaworthiness of the OCEAN ALLIANCE.
Louisiana courts of appeal should apply the manifest error standard of review in general maritime and Jones Act cases. Milstead v. Diamond M Offshore, Inc. 95-2446, (La.7/2/96), 676 So.2d 89.
Claims based on negligence and unseaworthiness are separate and distinct, but the factfinder's conclusions as to each are treated similarly on review. These findings of fact may not be disturbed unless they are manifestly erroneous or clearly wrong. Stobart v. State, [Through] Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Under Stobart, in order to reverse a factual determination, an appellate court must find (1) a reasonable factual basis does not exist in the record for the finding and (2) the record establishes that the finding is clearly wrong or manifestly erroneous. Id.

*786 Jenkins v. Sonat Offshore U.S.A. Inc., 96 2504 (La.App. 1st Cir.12/29/97), 705 So.2d 1184.
Defendant asserts that the court erred in finding that it was necessary for plaintiff to brace his foot in order to move the pipe. Diamond urges that its expert, Calvin Barnhill, testified that plaintiff placed himself in an unreasonably dangerous position by bracing his foot against the track while moving the pipe. In the present case, the trial court considered the testimony of defendant's expert and concluded as follows:
Calvin Barnhill, an expert called by Diamond, testified Crane should not have braced his foot and that it was negligent for him to do so. The court disagrees with Mr. Barnhill. While standing on a slippery mud-covered floor, Crane could not have pushed the 1800 pound pipe without bracing himself in some fashion, and a seaman's duty is to do the work assigned, not to find the safest way to perform his work. Ceja V.[v.] Mike Hooks, Inc., 690 F.2d 1191 (5th Cir. 1892). Mr. Barnhill further testified that if Crane had not so braced himself, he could have simply side stepped the moving pipe. Again, the court disagrees. The court believes that it would have been easier for Crane to move with the secure footing of having a foot braced than just standing flat footed on a slippery floor, if time allowed him to side step the moving pipe.
Revised Reasons For Judgment.
The trier of fact is not bound by expert testimony, rather, expert testimony must be weighed just as any other evidence. Johnson v. Tregre, 98-512 (La. App. 5th Cir. 1/26/99), 726 So.2d 1105; Bourgeois v. Roudolfich, 580 So.2d 699 (La.App. 5th Cir.1991). The trial court, as trier of fact, has great discretion to accept or reject testimony of experts. Tannehill v. Joguyro, Inc., 97-571 (La.App. 5th Cir. 4/9/98), 712 So.2d 238. Whether a particular plaintiff acted reasonably under the circumstances is a question of fact. Price v. Exxon Corp., 95 0392 (La.App. 1st Cir. 11/9/95), 664 So.2d 1273. Breach of duty is a question of fact, or a mixed question of law and fact, and the reviewing court must accord great deference to the facts found and the inferences drawn by the finder of fact. Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225. Therefore the court had discretion to reject Barnhill's testimony, and from the record we detect no abuse of that discretion.
Defendant contends that the court's reference to Ceja v. Mike Hooks, 690 F.2d 1191 (5th Cir.1982), overruled by Gautreaux, demonstrates that the court misunderstood the appropriate standard of care attributable to seamen. We disagree.
In the revised reasons for judgment, the court considered the plaintiff's burden for proving causation in a Jones Act case and clearly stated:
In Shurlock[Scurlock] [Gautreaux], the 5th Circuit outlines the history of the Act and their vacillation on the standard of care between "slight" and "ordinary prudence," and hold that today, the duty of care owed by the employer, under the normal rules of statutory construction, retains the usual and familiar definition of "ordinary procedure". Thus, Jones Act negligence no longer differs from that of ordinary common law negligence.
As we appreciate the revised reasons for judgment, the trial court considered Gautreaux and determined that plaintiff met the burden of proof required of him as to causation of his injuries. The court cited Ceja for the proposition that a seaman's duty is to do the work assigned, not to find the safest way to perform his work; nevertheless we find that it did not rely on that case to determine that defendant was negligent and that plaintiff was not negligent. As cited hereinabove, the court stated:
That Calvin Crane has met the burden of proof required of him as to the causation of his injuries, regardless of whether the standard is "slight" or "reasonable prudence", that his injuries were caused *787 by the negligence of his employer, Diamond Offshore Management, Inc., and the unseaworthiness of the OCEAN ALLIANCE.
Revised Reasons for Judgment.
The Jones Act allows an injured seaman to bring a negligence suit against his employer. 46 U.S.C.App. § 688 (1994). The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery.
Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. See Davis v. Hill Engineering, Inc., 549 F.2d 314, 329 (5th Cir.1977); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-21, at 312 (2d ed.1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335-36 (5th Cir.1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review. Id. at 334-35. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances. Id. at 339.
Foster v. Destin Trading Corp., 96-803 (La.10/21/97), 700 So.2d 199.
The court understood the correct application of Gautreaux. The duty of care, whether of the employer or the seaman, is not slight, rather, the seaman need only produce "slight evidence" of causation. The court determined that defendant was 100% at fault, and that plaintiff was without fault. Considering the testimony and evidence (which we find to be accurately summed up by the trial court in the reasons for judgment, quoted at length throughout this opinion) under the appropriate standard of review, we hold that the findings of fact are amply supported by this record, and see no manifest error in the determination by the trial court that defendant was negligent in the several particulars enumerated in the reasons for judgment.
However, we must consider what negligence, if any, is attributable to plaintiff. Crane was still obligated to act with ordinary prudence, and any negligence on his part can reduce his recovery. A seaman is obligated under the Jones Act to act with ordinary prudence under the circumstances. The circumstances of a seaman's employment include not only his reliance on his employer to provide a safe work environment but also his own experience, training, or education. Gautreaux, supra. The reasonable person standard, therefore, and a Jones Act negligence action becomes one of the reasonable seaman in like circumstances. Gautreaux, supra.
The court considered Crane's experience in the industry:
Crane has presently completed three years of his college education. He obtained his first full time job at age 19. At that time, he had friends in his hometown that worked offshore, and thought the hours and money were attractive. In 1979, Crane applied, took a premployment [sic] physical and subsequently became employed by O.D.E.C.O. He started his offshore career with O.D.E.C.O. as a "roustabout." His employment with O.D.E.C.O. lasted from 1979 until 1990, when O.D.E.C.O. and Diamond ill merged. During those years, while employed by O.D.E.C.O. and Diamond M, *788 Crane worked his way through the ranks, or "rig pecking order" of roustabout, floor man, derrick man and ultimately becoming a driller. He loved his work and was attending college during his off time in the hopes of obtaining an engineering degree to better his position on offshore rigs.
On March 17, 1994, Crane, a 33-year old "derrick man" was employed by Diamond Offshore Management Company (hereinafter referred to as Diamond) on the rig OCEAN ALLIANCE. The duties of a derrick man involve the operation of the derrick, wherein he sits in a cab at the monkey board level and operates levers which move the drill pipe stands with hydraulically controlled arms. The derrick man also has duties in the mud room associated with the mud system and maintenance of the mud pipe.
The OCEAN ALLIANCE, a sea going vessel, is a semi-submersible, dynamic positioning, self propelled rig with an automated pipe handling and pipe racking system. Because of his position and relationship with the OCEAN ALLIANCE, Crane is legally classified as a seaman.
The testimony further showed that Crane normally did not push pipe, but worked in the derrick. However, he had pulled pipe before, and always braced his foot against the track when doing so without injury or incident. Plaintiff was standing on the side where most of the track (of pipe) was located and braced himself to get momentum in order to push the pipe.
On March 17, 1994, the day before Crane's scheduled crew change, and his 28 days off, Crane injured his back while he and a co-worker, Wayne Culliford, were "tailing pipe," a process that involves pulling 90 foot stands of 5-inch (on this date) drill pipe out of the well hole and stacking the pipe in a pipe rack on the derrick floor.
Immediately prior to the time of the accident, Crane was in the pump room, performing maintenance duties on the mud pump (below deck), when George McKensie, the "driller," called him to the rig floor to assist with a "short trip." When Crane arrived on the rig floor, the process had already begun and a roughneck by the name of Steve Boone, (or "Blue," as he was referred to) was already in the derrick, operating the upper pipe racking system. Wayne Culliford and Philip Johnson were the roughnecks on the rig floor. A few "stands" of drill pipe had already been removed and "racked." Shortly after Crane's arrival on the floor, the driller, George McKensie, called Philip Johnson away from the rig floor and sent him to clean the "shaker."
Crane was told to assist in the racking of the stands of pipe. Crane testified that there was an inch or two of mud on the rig floor so he braced his foot against the iron roughneck track and was pushing the stand of pipe toward the pipe rack when the 1800-pound stand of pipe came back on him. He testified that the pipe whipped him back and "crunched him up." When he tried to stand up, his back was hurting.
Revised Reasons for Judgment.
Crane had operated the mechanical roughneck and the lower racking arm but not very often.
Contributory negligence is defined as plaintiff's conduct which falls below the standard of care to which he should perform for his own protection. The standard is determined by the reasonableness of the conduct under all of the circumstances. Hano v. Louisiana Department of Transportation and Development, 519 So.2d 796, 798 (La. App. 1 Cir.1987), writ denied, 523 So.2d 861 (La.1988). Whether a particular plaintiff acted reasonably under the circumstances is a question of fact, which is reviewed by this court under the dictates of Stobart v. State, Department of Transportation and Development, 617 So.2d at 882, infra.
*789 Price v. Exxon Corp., supra.
In allocating fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985).
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
Watson, supra.
Clearly plaintiff was performing work under dangerous conditions. We think it plain that the realities of maritime employment have not changed since Gautreaux and therefore, even the reasonable seaman must accept the working conditions and equipment presented by his superior officer as part of his employment. We agree with the trial court that plaintiff did what a reasonable seaman would have done under the same circumstances. Upon being called to the rig floor, the requisite three men were present and plaintiff began to follow orders. It was not until after plaintiff began working that the third man was called away. Plaintiff could not have abandoned his position at that time, leaving Culliford to tail the pipe alone. The evidence preponderates toward the conclusion that Culliford tripped on the hose, causing the pipe to sway toward plaintiff. Plaintiff braced himself to avoid slipping on the muddy floor while handling an 1800 pound pipe, an action which he had performed before but which was not his customary job. Considering all the Watson factors as applied to the facts of this case, we find no error in the determination by the trial court that plaintiff was without fault.
UNSEAWORTHINESS
The owner of a vessel has a duty to furnish a seaworthy vessel. This duty is absolute and nondelegable. Florida Fuels, Inc. v. Citgo Petroleum Corp., 6 F.3d 330, 332 (5th Cir.1993). It extends to a defective condition of the ship, its equipment, or appurtenances. Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir.1992). A ship's equipment and appurtenances include most objects and things on or attached to the vessel regardless of whether the item belongs to the ship or is brought aboard by a third party.
A breach of the duty of seaworthiness gives rise to a claim for general damages. The plaintiff bears the burden of proving that "the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354 (5th Cir.1988).
The test for determining unseaworthiness is one of reasonable fitness. The vessel, its equipment, and appurtenances need not be perfect, but all must be reasonably fit for their intended use. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 933, 4 L.Ed.2d 941 (1960). Unseaworthiness, then, is a relative term dependent on the circumstances.
Foster v. Destin Trading Corp., supra.
Defendant avers that the finding of the trial judge that the ship was unseaworthy because its automated racking system was not operational ignores the testimony that the system was not utilized on short trips such as the one in question, and that manual tailing was a safe practice. Diamond further urges that the determination by the trial court that Boone was incompetent *790 and ill-trained was contrary to the testimony produced at trial.
We note that an incident report admitted into the record states the following:
Preventative Measures-There were two men on the stand pushing [the pipe] back when the incident occurred. Two men are commonly used to perform this task. It takes a coordinated effort between the two men to do the job. The rig frequently cycles hands through the various job positions to train and familiarize the men at different positions. It may have been possible, in this case, that the two men were slightly out of sync in handling the stand. The pipe handling system was not being used at the time. The pipe handling system should be used whenever possible.
"Members of the crew of a vessel are warranted as seaworthy, and there may be liability for ... negligent orders, or for utilizing an understaffed or ill-trained crew." Vendetto, supra, quoting 1 Thomas J. Schoenbaum, Admiralty and Maritime Law § 6-25, at 333-34 (2d Ed.1994). The lack of a full complement in the crew may render a vessel unseaworthy, see, e.g., Comeaux v. T.L. James & Co., Inc., 666 F.2d 294, 299 (5th Cir.1982), supplemented, 702 F.2d 1023 (5th Cir. 1983); Springborn v. American Commercial Barge Lines Inc., 767 F.2d 89 (1985). A vessel crew that is inadequately trained, that is not instructed in the use of equipment, or that engages in unsafe methods of work, can constitute unseaworthiness, as well as the failure of a shipowner to provide adequate equipment for the crew to complete an assigned task. Milstead v. Diamond M Offshore, Inc., 94-1582 (La. App. 3rd Cir. 9/6/95), 663 So.2d 137; affirmed in part, reversed on other grounds, Milstead v. Diamond M Offshore, Inc., 95-C-2446 (La.7/2/96), 676 So.2d 89. See also Phillips v. Western Co. of North America, 953 F.2d 923, 928 (5th Cir.1992); Nelton v. Crewboats, Inc., 97-1024 (La.App. 4th Cir. 12/30/97), 706 So.2d 183 (an unsafe method of work may render a vessel unseaworthy).
An isolated act of operational negligence will not suffice to create an unseaworthy condition. Operational negligence must be "pervasive" or repeated frequently for it to rise to the level of an unseaworthy condition as in an "improper method of operation." Vendetto, supra, (emphasis supplied).
A "temporary and unforeseeable malfunction or failure of a piece of equipment under proper and expected use is sufficient to establish a claim of damages for unseaworthiness." Ferrara v. A. & V. Fishing Inc., 99 F.3d 449 (1st Cir.1996), citing Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 199 (1st Cir.1980). See also Ribitzki v. Canmar Reading & Bates Ltd. Partnership, 111 F.3d 658 (9th Cir.1997). The existence of a defective condition, however temporary, on a physical part of the ship may give rise to a condition of unseaworthiness. Ribitzki, supra, citing Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). Isolated "instantaneous" act of negligence within an otherwise seaworthy vessel do not give rise to a finding of unseaworthiness, as opposed to "congeries" of negligent acts that are of such a character or that continue for such a length of time that they become related to the status of the vessel. Robinson v. Showa Kaiun K.K., 451 F.2d 688 (5th Cir. 1971). Such "congeries" might create a "condition" of unseaworthiness, so that an individual act of negligence within or after the "congeries" might give rise to liability under the unseaworthiness doctrine. Robinson v. Showa Kaiun K.K., supra.
Barnhill did testify that pipe is racked manually on a routine basis. Culliford testified that on short trips, manual tailing is done because it takes less time. In addition, although Culliford testified as to Boone's ability to work the derrick, plaintiff testified that Boone was not competent and that operating the equipment required experience and training. The status of the trial court's findings on credibility *791 determinations is so well recognized as to require no citation, and we find no abuse of discretion in the conclusion of the trial judge that Boone was not competent to handle the derrick.
However, the trial court did not base its finding of unseaworthiness on a single act of negligence, or simply on the basis of equipment failure or the incompetency of Boone. Rather, it is clear that the court found that a combination of events rendered the vessel unseaworthy, including the fact that the piston was broken for a couple of weeks and could have been replaced or repaired within a day, and that the lower racking arm had been broken for at least one day and could have been repaired within a half-hour. To this the court added the finding that the floor crew was undermanned and that plaintiff was obliged to proceed without the third man to attend to the mud bucket. Plaintiffs expert, Kenneth Kaigler, testified that the fact that the tailing operation was partially manual and partially mechanical changes the mechanics of the fully automated rig. Machines can be coordinated. The coordination of the machine with men creates problems. Apparently relying on this testimony, the court found that the tailing of pipe in a partial mechanical and partial manual mode created a hazardous work environment for Crane and his fellow worker.
The fact that the crew was undermanned and was engaged in an unsafe method of work resulted in a tripping hazard. The ensuing chain of events evolved into a defective condition sufficient to uphold the finding that the OCEAN ALLIANCE was unseaworthy.[1]

CAUSATION AND DAMAGES
Defendant contends that the testimony and evidence did not provide a reasonable factual basis for the finding of the trial court regarding causation. It is argued that the medical evidence did not support the trial court's finding that plaintiff suffered a facet injury which warranted a three level lumbar facet fixation with a bone graft enhancement. Defendant argues that plaintiff's credibility was at issue here in that he presented conflicting stories about the occurrence of the accident.
The trial court found plaintiff to be "one of the most candid and forthright witnesses it has experienced". The trial court's factual findings and credibility determinations are entitled to great weight and will not be disturbed on appeal absent manifest error. When findings are based on determinations regarding the credibility of witnesses, the manifest error clearly wrong standard demands great deference to the trier of fact's findings, because only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Bostwick v. M.A.P.P. Industries, Inc., 97-791 (La.App. 5th Cir. 12/30/97), 707 So.2d 441, and the cases cited therein. After reviewing the record and according the deference due the trial court in this matter, we find no abuse of that discretion.
*792 The seaman need only produce slight evidence of causation. In the present case, Crane consulted several doctors. The trial court summed up that evidence as follows:
While Crane was off the rig for his days off, Diamond sent him to see Dr. Sidney R. Berry in Jackson, Mississippi, a board certified orthopedic surgeon. Dr. Berry first saw Crane on March 22, 1994. Dr. Berry admitted that Crane could have had a facet joint sprain which is adjacent to the transverse process muscle attachments. Dr. Berry was of the opinion that Crane suffered a strain or a sprain type of injury because there were no other specific findings.
Realizing no relief from the pain, Crane visited Dr. Robert Smith, who saw nothing in the tests performed to suggest any facet problems with Crane. Dr. Smith found the degenerative process was brought on by Crane's living 34 years and not the result of his work.
Dr. B. Thomas Jeffcoat, a board certified orthopedic surgeon, first saw Crane on May 20, 1994. He noted in the radiologist's report about articular facets being visualized by some increased signal intensity. Dr. Jeffcoat opined that an injury of the type that he found in Crane should heal in four to six weeks. His diagnosis was of a lumbar strain based upon Crane's history.
Dr. Daniel Scullin, a board certified "diagnostic radiologist", reviewed all of the films. Dr. Scullin's testimony was that there was nothing wrong with the plaintiff that was caused by the alleged incident of March 17, 1994 that needed fixing by surgery.
Dr. Adele Thiel's [sic] did an EMG and a nerve conduction velocity study at the request of Dr. Berry. These were done on August 12, 1994. In Crane's case, all of the nerve studies were normal. Additionally, the EMG studies of the muscles were found to be normal as well.
Revised Reasons for Judgment
The court continued, finding that because Crane's pain continued, he consulted with Dr. John Watermeier, an orthopedic surgeon. After reviewing Dr. Smith's medical records, X-rays and MRI report, Dr. Watermeier at first thought plaintiff suffered from a disc herniation.
He then had Crane undergo a Discogram and a CAT scan in February of 1995, and a facet block in June of 1995, based on Crane's complaints of pain during this period of time. After all of the tests, Dr. Watermeir's [sic] diagnosis was that Crane was suffering with a facet joint syndrome and believed that the source of Crane's pain was the facet joint rather than a nerve root problem based on this assessment, Dr. Watermeir [sic] recommended surgery to repair the problem.
In September of 1995, Dr. Watermeir [sic] fused three facet joints with screws and bone grafts at St. Charles General Hospital in New Orleans. Both Dr. Watermeir [sic] and Crane consider the surgery a success, particularly Crane who testified that his pain has been greatly reduced by the surgery.
Dr. Watermeir [sic] opined that Crane now has an anatomical and physical disability of 15% of the body as a whole. He can perform light duty work, but will never be able to perform offshore work as he had prior to his injury.
Revised Reasons for Judgment.
The court found that the primary objective of the plaintiff in being examined and treated by all of the doctors was to find the cause of his pain and have it remedied so that he could return to offshore work with his employer. The court further found that Crane's effort to cure his pain was in good faith, and that Crane's treatment with Dr. Watermeier was causally related to the accident.
Plaintiff has the burden of proving by a preponderance of the evidence that the injury was caused by the accident. Tartar v. Hymes, 94-758 (La. *793 App. 5th Cir. 5/30/95); 656 So.2d 756, 758, writ denied 95-1640 (La.10/6/95); 661 So.2d 475; Roig v. Travelers Ins. Co., 96-164 (La.App. 5th Cir. 12/11/96), 694 So.2d 362. There is a legal presumption of causation when the evidence shows that the plaintiff was in good health prior to the accident, but after the accident, the symptoms of the disabling condition appear and continuously manifest themselves. Dabog v. Deris, 625 So.2d 492, 493-494 (La.1993); Tartar v. Hymes, 656 So.2d at 758; Orgeron v. Prescott, 93-926 (La.App. 5th Cir. 4/14/94); 636 So.2d 1033, 1040. To overcome this presumption, the defendant must show that some other particular incident could have caused the injury in question. Maranto v. Goodyear Tire & Rubber Co., 94-2603, 94-2615, (La.2/20/95), 650 So.2d 757, 762; Spillers v. ABH Trucking Co., Inc., 30,332 (La.App. 2nd Cir. 4/13/98), 713 So.2d 505, 509; Lacy v. ABC Ins. Co., 97-1182 (La.App. 4th Cir. 4/1/98), 712 So.2d 189, 193. This issue is factual and subject to the manifest error review. Lacy, supra. However, the medical evidence must show there is a reasonable possibility of causal connection between the accident and the disabling condition. Dabog v. Deris, 625 So.2d at 493-494; Roig v. Travelers 694 So.2d 362 at 377; Orgeron v. Prescott, 636 So.2d at 1040.
Defendant avers that plaintiff returned to work on "light duty" and that Culliford saw him swinging a sledge hammer, which activity caused the injuries now alleged. However, Culliford did not testify that plaintiff appeared to have injured himself in doing so. The record shows that Crane worked for his employer and its predecessor for 15 years preceding the accident without physical limitation. There was no indication that he had back problems or complaints prior to the accident, but that since that date he has continued to experience pain which was not alleviated until his surgery. None of the doctors opined that plaintiff was lying or malingering. We have found no reason to doubt his credibility. He continued to seek medical relief from his pain from the time of the accident. We find that the record supports the finding that a causal relationship existed between the accident and the surgery.
A tortfeasor is required to pay for medical treatment of his victim, even for overtreatment or unnecessary treatment, unless such treatment was incurred by the victim in bad faith. Orgeron v. Prescott, 93-926 (La.App. 5th Cir. 4/14/94), 636 So.2d 1033; Sumrall v. Sumrall, 612 So.2d 1010, 1014 (La.App. 2nd Cir.1993). The question of whether plaintiff needed the surgery is resolved by the fact that his symptoms abated thereafter. Plaintiff testified that following surgery his leg and foot improved "a lot", and he regained the feeling in his toes. This improvement was confirmed by his wife. We agree with the court that plaintiffs effort to relieve his pain appears to have been in good faith and therefore even if surgery was unnecessary, defendant is nonetheless obliged to pay for it. This assignment of error is without merit.

LEGAL PRESUMPTIONS
Defendant contends that the trial court erred in applying certain legal presumptions. First, the court determined that "the unexplained failure of defendant to produce the minutes of the post-accident weekly safety meeting in which causes of the accident and means to prevent a recurrence were discussed, which minutes were known to have been in the possession of defendant, creates an inference that the evidence contained in those minutes was unfavorable to defendant" citing Salone v. Jefferson Parish Dept. of Water, 94-212 (La.App. 5th Cir. 10/12/94), 645 So.2d 747. Defendant argues that there was no evidence introduced to establish that Diamond possessed any safety meeting records other than those which were produced prior to trial. There was testimony that weekly safety meetings were held and that minutes of these meetings were always made. Forms utilized for such weekly meetings were *794 introduced at trial. However, the only document generated from the rig itself regarding this accident was an accident/incident report. Where a party fails to produce evidence available to him, the presumption is that the evidence would have been unfavorable to him. Williams v. General Motors Corp., 93-0287 (La.App. 4th Cir. 2/11/94), 639 So.2d 275, writs denied, XX-XXXX-XX-XXXX (La.11/11/94), 644 So.2d 387, 388; Morehead v. Ford Motor Co., 29,399 (La.App. 2nd Cir. 5/21/97), 694 So.2d 650, 656. The presumption is not applicable when the failure to produce the evidence is adequately explained. Constans v. Choctaw Transport, Inc., 97-0863 (La.App. 4th Cir. 12/23/97), 712 So.2d 885, 902. We said in Cooper v. Diamond Offshore Drilling, Inc. 96-924 (La.App. 5th Cir. 3/25/97), 692 So.2d 1213, 1217:
The first such inference concerned the three written reports made after the accident, none of which were produced in response to discovery ... In the present case, there was ample testimony, albeit contradictory and often confused, both in depositions and at trial, to establish that the three reports existed at one time, and there is no question that they were never produced. While it may well be that the "pipe book" kept by Pretus was thrown away or lost, there was no real explanation as to what happened to the driller's book or the weekly safety report. In this circumstance, the adverse inference regarding the reports was properly applied.
We find the same analysis applies here. There was no explanation as to the whereabouts of the safety meeting report. Defendant merely denied possessing such (a regularly kept) record for the one period of time in question. We find the presumption was correctly applied in the present case.
Defendant also complains of the presumption made by the court that "the driller, George McKenzie, was a witness available to defendants with particular knowledge of material facts pertinent to this case. Mr. McKenzie, however, was not called as a witness, and was not available to plaintiff. His exclusion thereby invoked the presumption that if called, he would have testified adversely to defendant," citing Don Smart & Associates v. Lanier Business Products, 551 So.2d 665 (1st Cir.1989); Shelvin v. Waste Management, Inc., 580 So.2d 1022 (3rd Cir.1991).
Mr. McKenzie was an employee of defendant working, at or near the time of trial, in Scotland. His deposition was noticed by defendants, and, according to the record, canceled[2]. The trial court must consider all the facts and circumstances in the case in deciding whether the presumption will apply. Green v. Cement Products Servs., 526 So.2d 493 (La.App. 1st Cir.), writ denied, 531 So.2d 270 (La. 1988). Moran v. Harris, 93 2226 (La.App. 1st Cir. 11/10/94), 645 So.2d 1244, 1248.
A deposition may be taken by telephone if agreed to by all parties. La. C.C.P. art. 1436.1. The deposition of McKenzie was available to plaintiff as well as to defendant, and the record does not reflect a valid reason why the witness could not have been deposed by Crane prior to trial.
An adverse presumption arises upon the unexplained failure of a party to call a witness who possesses peculiar and material knowledge to that party's case; however, this presumption is rebuttable. Faucheux v. Hooker Chemical Corp. ., 440 So.2d 1377, 1382 (La.App. 5th Cir. 1983), writ denied 444 So.2d 1238 (La. *795 1984). Further, when the silent witness is available to either party, the presumption is inapplicable.
W. Handlin Marine, Inc. v. Gulf States Marine, Inc., 624 So.2d 907, 912 (La.App. 5th Cir.1993). Also Cooper v. Diamond, supra. Therefore it appears that the court should not have applied the presumption in the present case. However, the court considers the presumption as it would any other relevant evidence. Comeaux v. Poindexter, 527 So.2d 1184 (La. App. 3d Cir.1988); Gurley v. Schwegmann Supermarkets, Inc., 617 So.2d 41 (La.App. 4th Cir.1993). Considering the entire record and the evidence produced at trial, we find that the presumption was not prejudicial so as to require reversal or amendment. See also Cooper v. Diamond, supra.
Defendant also urges that the court erred in refusing to allow it to call the plaintiff to the stand in its case in chief. Counsel for plaintiff cross examined plaintiff regarding his accident. After Culliford testified, Diamond alleges that different circumstances were described and discrepancies arose, for which it should have been allowed to recall the plaintiff for further cross-examination under La. C.E. art. 611.[3] The matter of permitting recross-examination is in the sound discretion of the trial judge whose rulings will not be overturned in the absence of some showing of an abuse of discretion and resulting prejudice. State v. King, 355 So.2d 1305 (La.1978); Community Bank of Lafourche v. Motel Management Corp. of Louisiana, Inc., 558 So.2d 641 (La.App. 1st Cir.1990). In the present case, no new matter was brought out on redirect entitling defendant to recross plaintiff under C.E. art. 611. Rather, the testimony of the defense witness was elicited as an attempt to impeach of the plaintiff. When no new issues are raised on redirect examination, recross-examination is not proper. State v. Hidalgo, 95-319 (La.App. 5th Cir. 1/17/96), 668 So.2d 1188, 1194. We find no prejudice to the defendant in the present case inasmuch as the trial court made a credibility determination well within its discretion. This assignment of error has no merit.

PRE-JUDGMENT INTEREST
Defendant avers that it was error for the court to award pre-judgment interest on future damages. We agree. In a Jones Act claim prejudgment interest is not permitted on future damages. Milstead v. Diamond M Offshore, Inc., 95-2446 (La.7/2/96), 676 So.2d 89; Walton v. Cooper/T. Smith Stevedoring, 97-0100 (La. App. 4th Cir. 3/4/98), 709 So.2d 941. The $150,000.00 award for general damages did not disclose what portion of that award was for future damages. Therefore, we must remand the matter to the district court for apportionment of the general damage award into past and future components, for the calculation of prejudgment interest as to all past losses, and for the calculation of post judgment interest as to all losses, past and future.

MAINTENANCE
Plaintiff avers that the trial court erred in failing to award maintenance, damages for failure to pay maintenance, and attorney's fees. The trial court made no mention of this award, and therefore it is presumptively denied. See Peterson v. Gibraltar Sav. and Loan, 97-725 (La. App. 5th Cir. 2/20/98), 711 So.2d 703.
In this case, maintenance and cure were paid until the plaintiff began treatment with Dr. Watermeier. The trial court found that following the accident, plaintiff was had continuous and unrelenting problems *796 with his back leading up to the surgery on September 21, 1995.
A seaman is entitled to recover expenses for the cost of food and lodging that is equivalent to the food and lodging that he would have received on the vessel. Thompson v. Zapata Haynie Corp., 562 So.2d 44, (La.App. 3rd Cir.1990); Springborn v. American Commercial Barge Lines, Inc., 767 F.2d 89, 94-5 (5th Cir. 1985). In order to recover maintenance, a seaman must present some evidence that he actually incurred expenses for his support. Steed v. Stokes Towing Co., Inc., 96-1008 (La.App. 5th Cir. 6/30/97), 709 So.2d 790; Heaton v. Gulf Intern. Marine, Inc., 536 So.2d 622, 626 (La.App. 1st Cir. 1988); Thompson v. Zapata Haynie Corp, supra. The amount of maintenance to which a seaman is entitled is a question of fact to be decided based upon the evidence presented to the trial court. Comeaux v. Basin Marine, Inc., 93 1624 (La.App. 1st Cir. 6/24/94),640 So.2d 833, citing Springborn v. American Commercial Barge Lines, Inc., supra; Thezan v. Maritime Overseas Corporation, 708 F.2d 175, 182, (5 th Cir.1983), cert. denied, 464 U.S. 1050, 104 S.Ct. 729, 79 L.Ed.2d 189 (1984); Tate v. American Tugs, Inc., 634 F.2d 869, 870 (5th Cir.1981). See also McWilliams v. Texaco, Inc., 781 F.2d 514 (5th Cir.1986).
In the present case, no evidence of plaintiff's expenses nor of the value of food and lodging on the vessel was introduced. Therefore, the trial court properly declined an award on this item of damages. See Thompson, supra.
Regarding punitive damages, the Fourth Circuit has stated as follows:
A claim for punitive damages for wrongful failure to pay maintenance and cure arises under the general maritime law. Punitive damages are not recoverable under the general maritime law. Bridgett v. Odeco, Inc., 93-1536 (La.App. 4th Cir.12/15/94); 646 So.2d 1249, writ denied, 95-0381 (La.3/30/95); 651 So.2d 840; Guevara v. Maritime Overseas Corp., 59 F.3d 1496 (5th Cir.1995), cert. denied, 516 U.S. 1046, 116 S.Ct. 706, 133 L.Ed.2d 662 (1996).
Punitive damages are contrary to Louisiana legal philosophy and are only permitted where specifically provided for by statute:
[U]nder Louisiana substantive law, absent express authorization by statute (i.e. LSA-C.C. art. 2315.3 and 2315.4), punitive damages are not allowed in Louisiana. Edmonds v. Boh Bros. Construction Company, 522 So.2d 1166 (La. App. 4th Cir.1988.)

Price v. Louisiana Dept. of Transp. and Development, 608 So.2d 203 (La. App. 4th Cir.1992).
Fairley v. Ocean Drilling and Exploration Co., 95-1542 (La.App. 4th Cir. 2/19/97), 689 So.2d 736.
The trial court properly denied punitive damages in the present case as such are not recoverable.
For the foregoing reasons, the judgment is amended to reflect that pre-judgment interest is due only on past damages and the matter is remanded to the district court for apportionment of the general damage award into past and future components, for the calculation of prejudgment interest as to all past losses, and for the calculation of post judgment interest as to all losses, past and future. In all other respects, the judgment is affirmed.
AMENDED IN PART; AFFIRMED IN PART; REMANDED.
NOTES
[1] Compare Hae Woo Youn v. Maritime Overseas Corp., 605 So.2d 187 (La.App. 5th Cir. 1992), reversed in part [as to damages] 623 So.2d 1257 (La.1993), in which this court affirmed the trial court's determination of unseaworthiness. A broken winch which could have easily been repaired caused a crew not properly trained in operating the winch to use an unsafe steam valve, which was not a safe method, and not the method intended in the design of the ship. "The negligence of a crew member in employing a method approved by his employer is actionable....The Court is not impressed by the defendants' efforts to blame the accident on [plaintiff's] use of the method employed by him, instead of their failure to train their crew, and to repair their broken equipment which they provided to Youn....The Court is not impressed by the claim that Youn used a `shortcut' in view of the Captain's testimony that they were in a hurry to take off, and all witnesses' testimony that Youn was an experienced, knowledgeable bosun. The Court finds that had the winch been repaired, or had the untrained crew members stayed at their post, or had the steam valve not been overcharged, the accident would have been avoided."
[2] In a letter dated April 9, 1998, defendant notified plaintiff that he had scheduled a telephone deposition. On April 13, 1998 plaintiff notified defendant that without the safety meeting minutes(see above), he could not participate in the deposition of Mr. McKenzie. Defendant responded that it was "not going to be able to take McKenzie's deposition, so please accept this as notice of its cancellation. Perhaps if I had heard something more from you ... I may have been able to make other arrangements but that did not happen." It is not clear why defendant was not able to take the deposition.
[3] La. C.E. art. 611(D) reads:

Scope of redirect examination; recross examination. A witness who has been cross-examined is subject to redirect examination as to matters covered on cross-examination and, in the discretion of the court, as to other matters in the case. When the court has allowed a party to bring out new matter on redirect, the other parties shall be provided an opportunity to recross on such matters.