817 So.2d 255 (2002)
Harold YOUNCE
v.
PACIFIC GULF MARINE, INC. and ABC Insurance Company.
No. 01-CA-546.
Court of Appeal of Louisiana, Fifth Circuit.
April 10, 2002.
*259 John H. Clegg, Daphne P. McNutt, McGlinchey Stafford, New Orleans, LA, for defendant-appellant.
Sean D. Alfortish, Michael E. Holloway, Salvador M. Brocato III, New Orleans, LA and Robert E. Arceneaux, Metairie, LA, for plaintiff-appellee.
Wiley J. Beever, Raylyn R. Beevers, Gretna, LA, Defendant-Amicus.
Court composed of Judges SOL GOTHARD, THOMAS F. DALEY and CLARENCE E. McMANUS.
McMANUS, Judge.
In this matter, finding no manifest error in any of the rulings below, we affirm the judgment awarding damages, maintenance and cure and attorney's fees to Plaintiff Appellee, Harold Younce, and, in addition, affirm the denial of a motion to recuse the trial judge.

STATEMENT OF THE CASE
The instant matter was instituted on January 2, 1998, with Plaintiff Appellee, Harold Younce's, Seaman's Petition.[1] The suit named as Defendant Appellant Pacific Gulf Marine, Inc. (PGM), and sought damages based on Younce's claims under the Jones Act and General Maritime Law. In addition, the suit also claimed attorney's fees grounded in the claim that PGM had arbitrarily and without justification stopped Younce's maintenance and cure payments. PGM's Answer was filed on September 1, 1998.
During the very early proceedings in this matter, various pre-trial matters had been heard by an ad hoc judge; the trial on the merits was ultimately presided over by Judge Ross P. LaDart, who took office in May of 1999. The record shows that Judge LaDart first heard pre-trial motions in this matter on June 25, 1999. On June 24, 1999, an order was signed allowing Wiley J. Beevers to enroll as co-counsel, representing Younce.
On August 11, 1999, PGM filed a Motion in Limine to Exclude Unreliable and Inadmissible Testimony Sought to Be Offered by Plaintiffs Experts. This motion sought to exclude, on the basis of a Daubert objection, the testimony of Younce's treating physician, Dr. John Watermeier, M. D.
According to the record, the Daubert motion had been the subject of a pre-trial conference held on August 18, 1999; during the recorded proceedings on that date, the trial judge denied the motion, ruling *260 that any such objections would simply go to the weight of Dr. Watermeier's testimony.
The trial in this matter was held over scattered dates in August, 1999, December, 1999, and February, 2000. During the trial, PGM's Daubert motion was again urged during Dr. Watermeier's testimony.
At the conclusion of Younce's case in chief, the trial judge denied a Motion for Directed Verdict on the issue of whether PGM had arbitrarily stopped Younce's maintenance and cure.
The record contains a handwritten judgment signed by Judge LaDart on March 25 (or March 26the date is not clearly written), 2000. There is no minute entry accompanying this judgment, nor is there any indication that service was made on counsel of record.
On March 30, 2000, PGM filed a Motion to Recuse Judge LaDart, alleging that Judge LaDart's "longstanding professional and financial relationship" with Wiley Beevers had given rise, during the trial of this matter, to bias on Judge LaDart's part in Younce's favor.
On April 4, 2000, the recusal was reallotted to Judge Ronald D. Bodenheimer for hearing. Also on April 4, Judge LaDart brought (some part of) the record in this matter to Judge Bodenheimer's chambers; the handwritten judgment was included as part of the record. At a hearing held on April 26, 2000, Judge Bodenheimer, based on the handwritten judgment of March 25 (or 26), held that the post-judgment motion to recuse was not timely.
Notice, stating that Judge LaDart had signed a judgment on the main demand, was issued on April 26, 2000. Extensive written reasons were filed into the record on May 2, 2000. The judgment awarded Younce general damages as follows: $200,000.00 for the cervical injury; $250,000.00 for the lumbar injury; $68,000.00 for the knee injury; $75,000.00 for the shoulder injury; $84,172.00 in past lost wages and $328,833 in future lost wages; past maintenance benefits of $8,952.00; and medical specials (as itemized in reasons for judgment) in the amount of $152,766.00. In addition, the judgment ordered PGM to continue maintenance and cure payments until "plaintiff reaches maximum medical cure as determined by a physician."
On May 31, 2000, a panel of this Court, under docket number 00 C 1052, based on the finding that the handwritten judgment would not operate to bar the filing of a recusal on all grounds, remanded the matter for a hearing based on allegations of professional and financial relationships between Beevers and Judge LaDart.
On June 13, 2000, PGM filed a motion to recuse Judge Bodenheimer. This motion, too, was re-allotted, and on July 17, 2000, Judge Martha E. Sassone granted the motion, based on the finding that Judge Bodenheimer would be called as a witness regarding the handwritten judgment.
The motion to recuse was ultimately denied by Judge Alan J. Green, after proceedings held August 29 and 30, 2000. The written judgment was signed September 8, 2000.
Pursuant to post trial motions filed by both parties, and after several post trial hearings, a judgment was signed on October 20, 2000, in which the trial judge found that PGM had improperly stopped Younce's maintenance and cure; the judge therefore awarded attorney's fees in favor of Younce's counsel. In a judgment signed on October 24, 2000, the trial judge awarded, and adjusted the awards for, various special damages and costs. In addition, in this judgment, the trial judge "bifurcated" the awards of general damages to allow *261 pre-judgment interest only to awards for past damages.
PGM's timely motion for appeal followed.

FACTS
The instant suit arises out of an accident that occurred on December 31, 1995, on the M/V Sugar Islander. Younce was injured when he was lifted by, then dropped from, a metal cargo cage being hoisted from the pier alongside of the ship. Younce's original petition alleged negligence on the part of the crew conducting the operation during which he fell; he alleged also that a defect in the metal cage rendered it, and thus the ship, unseaworthy.
At the time of the accident, the ship's personnel were employed by Defendant PGM pursuant to a management contract between PGM and the owners of the vessel. Plaintiff Younce was employed as an able bodied (AB) seaman on the Sugar Islander on the date in question; it was stipulated before trial that Younce had been so employed from October 15, 1995 through January 2, 1996. All of the ship's employees who testified, testified that Younce had been a good worker over the course of the cruise, and that he had never exhibited any infirmities that interfered with his work. On December 31, 1995, the ship had just returned from overseas and was docked in Morehead City, North Carolina.
At the time the accident occurred, the ship's hands had been engaged in offloading the ship's CO2 tanks for maintenance and possibly refilling. Directing the operation was the ship's first mate, John Hanley, who had been operating the winch being used to transport the tanks from the ship to the wharf. Younce had been on the pier, along with Jean Couvillion, the ship's, or, one of the ship's, QMED/OS(s). Younce and Couvillion had been unloading the tanks from a metal cage (sometimes described as a basket) for retrieval by the maintenance contractor. In addition, during the operation, Younce had been serving as the signalman, directing Hanley as Hanley lifted the cage off of the pier. The ship's second mate, Jeffery Sutton, was assisting in the operation on the deck of the ship.
Hanley testified that they had begun the operation using a cargo net to move the tanks, but had switched to the metal cage to take advantage of its increased capacity. Hanley stated that he didn't know who the cage belonged to; he and the ship's boatswain had found it sitting on the dock. Hanley had "looked at" the cage, but hadn't "inspected" it before the crew put it into use. He stated that the only problem he remembered in connection with the cage was that the basket's gate had to be "jostled" to allow closing when the cage was full.
Younce described the cage as "banged up," or, "defaulted (sic)." He testified that he and Couvillion had been required to push and pull the gate to align the sides of the cage, which allowed a pin to be inserted into the closing fixture. In addition, he stated that after it had started to rain, efforts to close the basket had become more difficult: he had been required to use his body as leverage to force the gate to close. He testified that it had taken "considerable" force to push, and hold, the gate closed to insert the pin. Finally, Younce testified that Hanley "had to know" that he and Couvillion were having problems with the cage because he had stopped work to "check it out" at least once.
Couvillion agreed, by way of a video deposition, that the cage's gate was "warped." He testified that he and *262 Younce had had to use "pressure" to align and close the gate; Younce had been "pushing against" the gate, with his arm on top of the basket, to allow Couvillion to insert the pin.
The captain of the ship, Martin Macisso, testified that he could not recall having received any complaints about the basket during the operation.
David Cole, Younce's expert witness, opined that the problems with it rendered the basket unseaworthy. Cole had been in the Coast Guard for twenty years, working as part of the marine safety program. He had been a casualty investigator for the Guard, thirteen years, and a hearing officer for a year with the 8th Coast Guard District. He was qualified as an expert in marine safety.
Younce described the accident as follows. He stated that as he and Couvillion had been pushing and pulling, as he was still pulling, the basket suddenly lifted off of the dock. He testified that he had been "hung" on the basket as it began to lift. As his left arm or jacket "caught" on the cage, he felt something "grab" him, and though he "jerked and twisted," he had been unable to pull off of the cage; he was pulled some distance off of the pier, then fell to his knees. Younce testified positively that he had not signaled for Hanley to start lifting the cage.
Hanley testified that Younce had given a signal to lift the basket. However, his testimony was very unclear on whether he had noticed Younce's left arm in, or on, or near the cage as he engaged the winch. He stated that he had started to lift the cage, heard Younce "hooting and hollering," and stopped lifting the cage when it was a few inches off of the ground. He testified that he had not noticed Younce having any problems clearing away from the basket as it was lifted, nor had he seen Younce lifted off of the dock.
Couvillion also testified that Younce had signaled for Hanley to start lifting the cage. Couvillion's description of the accident is that the basket "hit" Younce under the arm as it was rising off of the dock; he stated that Younce had "jumped" away from the cage as it continued to move. He did not recall that Younce had actually been lifted off of the ground; he did not recall Younce falling to the ground.
David Cole, Younce's expert, testified that it would have been unsafe for Hanley to lift the basket even if Younce had signaled. Cole testified that it is the crane (winch) operator's duty to make sure that all deck crew are safely away from the crane's load before the load is lifted. Therefore, it had been Hanley's option to "overrule" Younce's signal if Hanley had noticed a possible hazard. Cole found Hanley negligent for having lifted the cage before it had been safe to do so.
Hanley testified that it had not been inherently dangerous for the crew to stand near the basket as it was lifted; he testified that this is sometimes necessary to steady loads as they are lifted. Captain Macisso agreed with these assertions.
The record contains the following various forms completed over the course of a few days after accident. A Statement of Witness form, executed by Couvillion and identified by him during his deposition, includes the statement that,
We were removing CO2 bottles from a basket & loading them on a truck, when we finished, Harold & I were putting a pin back in a gate to close it on the basket. The gate was bent so Harold pulled the gate closed (sic) & I started to insert the pin, when the basket was lifted off of the dock.
A copy of Coast Guard form CG-2692, completed by Macisso on January 2, 1996, contains the following statement:

*263 Man was holding runner when it was being hoisted, at which time he states "he felt a pull in his shoulder area."
The man reported this directly to the chief mate who in turn sent him to me. I in turn sent the man to the agent who took him to the emergency room. Man was released to return to work and subsequently did not lose any work time. The man came to me three days later and told me he wanted to be relieved in a normal rotary manner. Man was paidand signed off the vessel on 2nd Jan. 1996.
This form indicates that Younce's shoulder was hurt.
The record also contains a copy of a Vessel Report of Illness To Crew form signed by Macisso on January 3, 1996. This form includes the notation that the basket was "raised before the AB could clear his arm." The form also states that Younce returned from having seen a Dr. Bell with a "light duty cert. for 5 days."
Younce's Statement of Person Reporting Injury form, also signed on January 3, includes Younce's statement that, "Because [the gate] was bent.... I started to pull the gate while Gene applied the pin when the basket was picked up on deck." On this form, Younce indicated that he had injured his left shoulder, left elbow, and his arm.
The record contains an Authorization for Medical Treatment form, signed by Macisso and Dr. J. Bell, M.D., on December 31, 1995. This form notes a diagnosis of a left shoulder and elbow strain, and contained a restriction from heavy lifting for five days from that date.
There is some conflict in the testimony about how Younce obtained the authorization form. Hanley testified that Younce had continued to work after the accident; Captain Macisso's testimony was that Younce had initially refused medical attention, then gone on his own to a local hospital without the authorization, resulting in a second trip to the hospital with a signed form. Younce testified that Hanley and the ship's agent had taken him to Macisso's office immediately after the accident; Sutton's and Couvillion's testimony is in accord with this. The ship's agent, Todd Johnson, who had been on board the Sugar Islander when the accident occurred, confirmed he had "made arrangements" for Younce to go to the doctor shortly after the accident.
The Emergency Department Registration form completed at Cartaret General Hospital on December 31 shows that Younce was prescribed Nalfon 600 and a sling for his left arm.
Younce was subsequently seen at the Cartaret Family Practice Clinic on January 2, 1996, by Todd D. Ensign, a physician assistant.
At trial, Ensign testified that he had seen Younce for a follow up exam after the emergency room visit. He testified that he had diagnosed a probable shoulder strain and a possible rotator cuff tear. He also testified that though he had done an exam to rule out neurologic damage, it had not been a full exam that would have ruled out any possibility of a back injury. Ensign identified a Physical Medicine Request Form he had signed on this date, which shows a diagnosis of shoulder strain and prescribed therapy. Ensign also identified a Certificate to Return to School or Work slip, which includes the remark that Younce had been seen in the emergency room for an acute shoulder injury, and a notation that he should not return to work before January 7 of 1996. Regarding this last form, Ensign testified that the lack of a signature was simply a clerical error.
Captain Macisso testified that he had been unable to comply with the Certificate *264 to Return to School or Work slip because it was unsigned.
Younce testified that though he had been in "major pain" after the accident, he had tried to continue to do his job, not realizing how seriously he was hurt. He left the ship on January 2, 1996, after Macisso told him that the ship could not provide the therapy recommended by Ensign. An Employment Report, signed by Macisso and Younce, indicates that Younce left the ship "voluntarily," and includes the following notation"man on light duty but wants off anyways." Jeffery Sutton testified that Younce, who was "obviously in discomfort," had been unable to carry his luggage off of the ship.
Younce testified that immediately after the accident, he had been "dazed." His immediate complaints were of pain in his left shoulder, neck, and left arm. He testified that through January and into February of 1996, he continued to suffer with pain in his back, neck, shoulder and knee. Though he had tried to "shake it off," his symptoms continued to worsen, and he eventually began treatment with Dr. Watermeier in March of 1996.
Dr. Watermeier testified that he had first seen Younce on March 8, 1996. He testified that Younce gave a history of two previous accidents, one in August of 1995 and the one in December of 1995. At his first visit, Younce had complained of pain in his left knee and left lower extremity, severe neck pain, frequent pain in his left arm and shoulder, and weakness of his left hand. Dr. Watermeier ultimately treated Younce for injuries to his cervical spine, left shoulder, left knee, and lower back. The following, addressing each injury in turn, is gleaned from Dr. Watermeier's office chart, narratives, and testimony at trial.
Dr. Watermeier ultimately diagnosed Younce's neck injury as cervical disc syndrome. His chart notes indicate that Younce first presented to his office complaining of pains in his neck; at Younce's first visit, Dr. Watermeier noted positive symptoms of a possibly serious injury and ordered tests to "rule out [a] possible cervical disc." MRI results reviewed in April of 1996 did indeed reveal a "very large" ruptured disc at C5-6, and in June of 1996, Dr. Watermeier performed an anterior cervical fusion at the C4-5, C5-6 levels, using bone splinters from Younce's hip to insert a graft. As of October of 1996, Dr. Watermeier's notes indicate that Younce's fusion appeared to be solid. However, the office notes also indicate that Younce was still experiencing pain in his neck as of April of 1998. Dr. Watermeier positively related the neck injury to the accident of December 31. He stated that Younce would have been unable to perform his job during the first two months aboard the Sugar Islander with the neck injury; he also testified that the injury was consistent with the mechanics of Younce's accident.
In addition, Dr. Watermeier ruled out any other possible cause of the injury, including a grand mal seizure Younce had experienced shortly before the accident on the Sugar Islander. Dr. Watermeier diagnosed Younce as having a 5 to 10% permanent impairment to the cervical spine as a result of the December 1995 accident.
In addition, during his testimony, Dr. Watermeier was questioned about the possibility that Younce's cervical injury had more probably been an aggravation of a prior injury. There was no question that Dr. Watermeier had not been aware, during his treatment of Younce, that Younce had suffered some sort of cervical injury some months before the Sugar Islander incident. However, there also seems no question that both treating physicians involved in this earlier injury had diagnosed a soft tissue injury only.
*265 By way of a deposition, Dr. Michael A. Wilensky, M. D., stated that he had seen Younce in May of 1995 for an accident that had occurred in April of that year. Dr. Wilensky ultimately diagnosed this injury as a generalized soft tissue injury of the cervical spinea "whiplash like" injury. Dr. Thomas Purser, III, M. D., saw Younce for this condition in June of 1995. Dr. Purser's deposition testimony was that though he had first suspected a herniated disc, as treatment progressed, Younce's symptoms ruled out this possibility, and Dr. Purser's final diagnosis was that Younce had suffered a muscular injury only. Dr. Purser released Younce as fit for duty in July of 1995, and stated that he would not have done so if Younce had been suffering with a herniated disc.
Finally, regarding Younce's cervical injury, though Dr. Watermeier had not originally been aware of the earlier neck injury, when he was questioned about it at trial, he testified that there was nothing in any of the newly related history that would change his having related the ruptured disc to the December, 1995, accident.
Dr. Watermeier also treated Younce for what was ultimately diagnosed as a partial rotator cuff tear and synovitis (swelling of the joints) in Younce's left shoulder. Dr. Watermeier performed an arthroscopy on the shoulder in June of 1996, and Younce subsequently underwent several months of therapy for the shoulder. Dr. Watermeier positively related the shoulder injury to the accident. In addition, Younce was diagnosed with a 5 to 10% permanent anatomical impairment to the shoulder as a result of the accident.
Younce treated with Dr. Watermeier for a knee injury, though Dr. Watermeier did not initially relate this injury to the December accident. This was because he had not been aware, when he first began treatment of Younce, that Younce had fallen to the deck after he was lifted by the cargo basket. Dr. Watermeier had been aware, during his treatment of Younce's knee, that Younce had suffered a previous injury to his left knee in 1994. Ultimately, Dr. Watermeier did relate the knee injury he treated to the December accident, based on the records from the 1994 injury, and based on his opinion that the knee injury would have rendered Younce unfit for duty over the entire course of his voyage on the Sugar Islander. In particular, Dr. Watermeier stated that an MRI done in 1994 had been "within normal limits." An arthroscopy done by Dr. Watermeier, however, revealed several conditions: a large contusion, located in the same spot as a bruise, a partial tear of the medial meniscus, and chondromalachia (softened cartilage under the kneecap). Dr. Watermeier diagnosed Younce with a 5 to 10% permanent anatomical disability of the left knee resulting from the accident.
Testimony regarding Younce's previous knee injury was introduced in the deposition testimony of Dr. Robert L. Barrack, M. D., who had treated Younce in November of 1994. Dr. Barrack stated that he had diagnosed a soft tissue injury only, a possible ligament sprain. He had released Younce to return to work in January of 1995. After Younce had returned in August of 1995, Dr. Barrack diagnosed localized tendonitis, prescribed medication, and again released Younce as fit for duty on October 5, 1995. Further, Dr. Barrack testified that the torn cartilage treated by Dr. Watermeier was "much more likely" to have been suffered subsequent to the MRI done of Younce's knee during treatment in 1994.
Finally, Dr. Watermeier treated Younce for what he ultimately diagnosed as lumbar disc syndrome. Dr. Watermeier testified that he had not initially concentrated on Younce's lower back because the initial *266 focus had been the neck, shoulder and knee injuries, which had been "particularly acute." However, Dr. Watermeier's records indicate that Younce had been suffering symptoms related to his lower back on his first visit. A History Questionnaire completed by Younce at his first visit indicates the following. Though Younce responded negatively to a question about back pain, he responded positively that he had been experiencing leg painburning, aching and crampingand numbness in his thigh, and weakness in his legs when shifting his weight from left to right. In addition, he indicated that he had been experiencing pain in his back or legs with coughing or sneezing, and increased pain with standing or lifting. Dr. Watermeier testified that these symptoms all relate positively to a lower back injury.
Though Dr. Watermeier's chart notes for Younce's initial visit indicate that a lumbar spine exam was within normal limits, an MRI result from a test done on April 2, 1996, indicates that Younce reported for the test with complaints of "neck and back pain." Further, though Dr. Watermeier testified at trial that Younce had not complained of back pain until December of 1996, his chart notes for a visit of December 4, 1996, contain the following notation: "Review of [Younce's] records shows that he did have initial complaints [with his back], but has had no further problems until just recently." An MRI and CAT scan were scheduled after the December 4 exam, and the MRI results revealed degenerative bulging at the L4-5 level. A neurological assessment done by Dr. Morteza Shamsnia, M.D., resulted in some abnormal findings, and Dr. Shamsnia diagnosed left L5/S1 radiculopathies. Dr. Watermeier performed surgery on Younce's lower back in June of 1998, removing the L4-5 disc and inserting two metal cages to stabilize the spine at this level. This operation also required the use of bone from Younce's hip.
In his trial testimony, Dr. Watermeier did relate Younce's lower back injury to the accident on the Sugar Islander. Dr. Watermeier related the injury to the accident based on the "mechanism of [Younce's] injury of December of '95." In addition, Dr. Watermeier testified that even if the complaints resulted from an aggravation of pre-existing degenerative changes, the aggravation was causally connected to the accident: Dr. Watermeier testified that twisting accidents are "primarily" the ones that will result in the aggravation of degenerative conditions. Further, Dr. Watermeier also testified that though Younce had "re-injured" his lower back in a slip and fall accident of October of 1998, the injuries related to that fall had largely resolved as of the trial date.
As of trial, Dr. Watermeier was still treating Younce for his lower back, and he also related the possibility of future diagnostic tests and/or surgery to the accident of December 31. Dr. Watermeier diagnosed Younce as having sustained a 10 to 15% anatomical impairment to the lumbar spine.
Dr. Watermeier testified that he had diagnosed Younce with a 25 to 45% disability to the body as a whole, and placed lifting, bending and stooping restrictions on Younce's ability to work in the future. Dr. Watermeier testified that Younce had not reached maximum medical improvement as of the date of trial, and he stated that as of the trial he still considered Younce temporarily, totally disabled.
During his treatment of Younce, Dr. Watermeier had referred him to a physical therapist for treatment of his neck, shoulder, and knee. Matthew Slimming, of the Wellness Aerobic & Sports Medicine Clinic, had seen Younce from July of 1996 *267 through January of 1997. In addition, Slimming had a recollection, as of the trial date, that Younce had complained of back pain on several occasions. He also recalled having authored a letter, addressed "to whom it may concern," and undated, in which he stated that Younce had "repeatedly reported low back pain" over the course of therapy.
PGM's medical expert, Dr. James LaBorde, M. D., was of the opinion that Younce had not suffered any injuries in the accident aboard the Sugar Islander. Dr. LaBorde related Younce's knee and lower back complaints to simple degenerative changes. He saw no objective medical evidence that the Sugar Islander accident had aggravated Younce's pre-existing knee condition, and he related Younce's cervical injury to Younce's accident in April of 1995. In addition, Dr. LaBorde had examined Younce prior to his lower back surgery. He reported a normal neurologic exam, and related Younce's lower back complaints to psychological causes. During his testimony, however, Dr. LaBorde stated that he had not read all of Dr. Purcer's records, and he also admitted that he had not reviewed Dr. Shamsnia's findings. In addition, he stated that he had "not specifically" been aware of the results of an exam performed on Younce by Dr. Kweli Amusa, M. D., shortly before he had embarked on the Sugar Islander cruise in October of 1995, and which pronounced Younce fit for duty. Once he had been made aware of this additional information, Dr. LaBorde stated that he would have "additional questions" about causation, and he acknowledged a "slight change" in his initial impressions. Finally, regarding causation, Dr. LaBorde testified that, "Nothing that anybody says is 100% accurate."
Dr. Amusa had been, at the time she examined Younce, associated with the Seafarers' International Union, and she had examined Younce in order to determine his fitness for duty. Dr. Amusa, by way of her deposition, noted that her routine exam had not revealed anything that would have rendered Younce unfit for duty. Specifically, she stated that she had found Younce's neck "normal," and had found nothing abnormalno redness or swellingin any of his joints. Dr. Amusa's Physical Examination Report contains the notation "good physical exam."
The record contains the following regarding Younce's loss of income claim.
Cornelius Gorman, who was qualified as a vocational rehabilitation expert, testified that given Younce's educational and work background, Younce was "most appropriately" employed working on a vessel. In addition, Gorman testified that Younce would never be able to return to work as an able bodied seaman, nor are there any available land-based jobs that would allow Younce to utilize his seaman's skills. Finally, Gorman testified that it is difficult to place someone with medical, especially orthopedic, problems in any kind of job.
Barney Hedgwood, PGM's vocational rehabilitation expert, was able to identify some jobs available to Younce that would take into account his restricted functional limitations. However, Hedgwood also testified that the availability of any jobs depended on Younce's having reached maximum medical improvement. He stated that since further tests and possible surgery were "imminent" for Younce, Younce would be unable to do even the jobs he had located.
Younce himself testified that he was unemployed as of the trial date; he testified that he had been unable to find any jobs "that my physical (sic) can handle." As noted above, Dr. Watermeier has placed various restrictions on Younce's ability to work, and the physical therapist, Matthew *268 Slimming, testified that it would be "very difficult" for Younce to return to work given his several injuries.
Randolph Rice, Younce's economic expert, testified that he had used Younce's income for the last year pre-dating the accident to calculate figures for lost earnings and lost future income. Rice testified that he had used only the one year as the basis for his calculations because the last year before the injury was the "most representative" of Younce's pre-injury earnings. Using Younce's 1995 earnings, Rice calculated Younce's lost income to be $84, 172.00; he calculated Younce's lost future earnings, as an able bodied seaman, to be $328,833.00.
Dan Cliffe, PGM's economic expert, testified that he had averaged Younce's income over a period of five years before the accident to arrive at a representative figure. Using this figure, he calculated Younce's lost future income to be between (on the low side) $174,685, and (on the high side) $189,375.00. However, Cliffe did testify that that there is no one methodology used exclusively for an accurate determination of lost future wages there is no standard within the economics profession requiring the use of one method or another.
Regarding Younce's claims that his maintenance and cure were arbitrarily terminated, we note that it had been stipulated before trial that the maintenance benefits had been stopped as of February 4, 1997. Philip Rapp, the administrative manager (and corporate representative during trial) of PGM, testified that the decision to terminate the benefits had been based on information that Younce had completed his prescribed physical therapy and on records provided to their office by Dr. Watermeier. This testimony refers to a chart notation of February 3, 1997, from Dr. Watermeier's office records. While this entry does include the statement that "[Younce] is doing great with his neck and shoulder," the entry also just as clearly states that Dr. Watermeier was considering performing an anterior lumbar fusion to correct Younce's lumbar disc syndrome. In addition, Rapp admitted that PGM had never been specifically informed that Younce had reached maximum medical improvement. He testified that PGM had instead simply "interpreted" the information they had to reach this conclusion.
In his lengthy reasons for judgment, the trial judge found that Younce had not given first mate John Hanley the signal to start lifting the cargo basket off of the dock. In so finding, the trial judge specifically noted that he did not find Jean Couvillion's statements to the contrary to be credible. In addition, the trial judge found that, "the cargo basket, which is an appurtenance of the M/V Sugar Islander was not reasonably suited for the purpose in which it was intended. Had the cargo basket worked properly, Mr. Younce could not have been forced to place his body in harm's way." The trial judge also found that Hanley was negligent for "lifting the basket before being signaled to do so."
The trial judge also found that Younce's injuries had been caused by the Sugar Islander accident, having specifically found that all of Younce's previous injuries had resolved before Younce boarded the Sugar Islander.
The trial judge found that Younce is unable to return to any gainful type of employment in the future; the trial judge adopted Younce's expert's figures for lost income and lost future income.
Finally, the trial judge found that PGM had been arbitrary in terminating Younce's maintenance and cure for having done so without adequate proof that *269 Younce had reached maximum medical cure.
The record contains the following evidence regarding the motions to recuse Judge LaDart and Judge Bodenheimer, in roughly chronological order, and though it is somewhat repetitive of what we noted in the Statement of the Case above.
The grounds for recusal, as stated in the motion, are that "Judge LaDart and plaintiff's co-counsel, Mr. Wiley Beevers, are personal friends with a longstanding professional and financial relationship; neither the relationship nor its extent was disclosed to the defense when Mr. Beevers enrolled as counsel."
The original petition in this matter had been filed on January 2, 1998. Several pre-trial matters were heard before an ad hoc judge before Judge LaDart was elected; Judge LaDart was elected in April of 1999. The record shows that Judge LaDart first presided over pretrial hearings in this case on June 25, 1999. The record also shows that Beevers had enrolled as counsel of record on June 24, 1999.
At hearings held in open court on August 8, 1999, Judge LaDart informed all parties that he is (or, was) a neighbor of Philip Rapp, PGM's corporate representative during trial of this matter. Judge LaDart informed the parties that Rapp had helped with his campaign; during the later recusal hearings, Rapp testified that he had done telephone calling on Judge LaDart's behalf. In addition, during the later hearings, both Judge LaDart and Rapp testified that Judge LaDart had instructed Rapp to inform his attorneys of their friendship, and the record includes a letter from PGM's attorneys to Younce's counsel containing this information.
In his testimony at the hearings on the motion to recuse Judge LaDart, Judge LaDart stated unequivocally that, during pretrial hearings, he had informed PGM that he is "friends" with Beevers and that Beevers had helped with the campaign. Though Judge LaDart could not remember precisely when he had done so, Beeves and Sean Alfortish (the attorney who associated Beevers) confirmed that Judge LaDart had provided this information before trial. In addition, Beevers did have trial notes (referred to but not introduced) indicating that this had occurred at a hearing on September 9. PGM's trial counsel, John Clegg, does not remember having been so informed by Judge LaDart. Judge LaDart also testified that his statements had not prompted Clegg to make "any inquiry at all" to obtain more detailed information.
Testimony from the recusal hearings indicates the following regarding Judge LaDart and Beevers's friendship. Both testified that they had been friends over the years, though not close friends. The two had had very limited professional involvement: Beevers testified that he had tried one case against Judge LaDart in the past, and that Judge LaDart, while sitting as an administrative hearing officer, had ruled against him in one other case. Both testified that they eat breakfast together frequently (or had, as of the hearing dates) at a restaurant located near the courthouse; Beevers did not remember whether the two had seen each other for breakfast during the Younce trial.
The testimony from the hearings shows the following regarding Beevers's involvement in Judge LaDart's campaign. Beevers testified that his wife and law partner, Raylyn Beevers, had been Judge LaDart's campaign finance committee chairman, and that Judge LaDart had been to the Beeverses' law office many times over the course of the campaign on related matters. Beevers testified that his firm had made two contributions to the campaign, one for $500.00 and one for $300.00; in addition, *270 the firm made in-kind contributions totaling $160.00. And though Raylyn had guaranteed a loan to Judge LaDart in the amount of $2,500.00, Beevers denied that he had made any personal contributions to the campaign. Beevers also testified that he had represented Judge LaDart in a suit arising out of the election, involving a restraining order filed to prevent the televising of a campaign advertisement. He stated that he had only spoken with Judge LaDart once over the telephone regarding the suit, and had filed papers in accordance with Judge LaDart's instructions. He testified that his "whole representation" of Judge LaDart in this matter had lasted "one hour and 59 minutes," as long as it had taken him to prepare and file papers. He stated that he had not even opened a file on the matter.
The public record shows that Beevers had represented Judge LaDart during the judge's campaign in matter 538-444, in Division "D" of the Twenty Fourth Judicial District Court. On Judge LaDart's behalf, Beevers had filed a Motion to Vacate a Cease and Desist Order on April 30, 1999; the motion had been granted that same day. There was nothing further filed in the record until Beevers withdrew from the matter September 24, 1999.
In his testimony regarding the suit during his election, Judge LaDart stated that he remembered having spoken with Beevers on the telephone, though he had not realized at the time that Beevers would actually handle the matter. This was because he had had "a number" of attorneys helping him with the campaign. He stated that the suit had been forgotten almost as quickly as it had come to his attention, and that he had never spoken with Beevers about it again. In addition, Judge LaDart testified that he had no memory of how much Raylyn Beevers or the Beevers law firm had contributed to his campaign, nor did he have any recollection regarding reimbursement made to the Beevers firm. He testified that his campaign accountant had handled these matters, and that there had been several parties authorized to sign checks for campaign expenses. Finally, Judge LaDart testified repeatedly that though he had no specific recollection about campaign contributions, such information is available as a public record in accordance with mandatory campaign finance reporting regulations.
The record discloses the following about the sale, on September 27, 1999, of Judge LaDart's former office building to Edward and Marie Lynn Reine, Raylyn Beevers's parents. During the hearings on the recusal, Edward testified that he and Marie Lynn had purchased the building for $130,000.00 they had borrowed $ 32,000.00 of the purchase price from Raylyn, and he and Marie Lynn had executed a collateral mortgage on the property to secure a loan made to the Beeverses for the remainder of the purchase price. He testified that payments on the note are made with funds drawn on the Beevers firm's trust account. As of the date of the hearings, the Beevers law firm was using the space for storage. Beevers acknowledged that he and Raylyn had signed the loan made to purchase the office building.
The documentary evidence introduced leaves no doubt that the Reines have title to the property.
Judge LaDart testified that he had had no knowledge of the Beeverses "facilitating" the sale of the building; he testified that at the time, he had been "absolutely" unaware that the Beeverses had signed a promissory note to finance the sale. Further, he testified that if the building had been appraised at a higher figure than the sale price, he himself had not paid for an appraisal, and had not seen one at any time before the sale. He testified that *271 given the slow economy, he was glad to sell the building to the Reines for the figure he received.
The trial on the merits of this matter was held over several dates in August and September of 1999 and February of 2000.
At hearings on the recusal, John Clegg testified that it had not been until after the trial on the merits of the matter was concluded, and while the parties were waiting for a judgment, that he had learned about possible personal and professional relationships between Judge LaDart and Beevers.
The record before us contains a handwritten, or, draft, judgment drawn up by Judge LaDart and dated March 25 (or, 26the writing is not clear), 2000; the record contains no minute entry or notice of judgment form in connection with this draft.
PGM's Motion to Recuse Judge LaDart was filed on March 30, 2000. Though Judge LaDart testified, at the recusal hearings, that he had at first denied the motion, we don't see this of record. What the record does show is that on April 4, 2000, Judge LaDart signed an order to have the matter re-allotted for a hearing on the motion. The matter was re-allotted to Judge Bodenheimer for hearing. Testimony also shows that it was probably on April 4 that Judge LaDart delivered part of the record to Judge Bodenheimer, and there is no question that the handwritten judgment was included with the record.
Judge LaDart testified that he had given several "papers" to Judge Bodenheimer, "pointing them out" for his consideration, for Judge Bodeheimer to do with as he "wished." He did not recall whether he told Judge Bodenheimer that the papers included a judgment; he testified that he was not sure whether the draft would constitute a judgment. He testified that he didn't file the judgment into the record in obedience to the automatic stay in place pursuant to the motion to recuse; he testified that he instead gave the papers to Judge Bodenheimer because he didn't want to "withhold" anything from him.
Judge Bodenheimer testified that when Judge LaDart gave him the papers, he did not realize that the papers were a judgment; he testified that he assumed they were simply handwritten notes Judge LaDart had taken during trial. Because this was so, he immediately instructed his minute clerk to seal the "notes" in the record; he did not look at the papers or attach "any importance" to them at that time. Judge LaDart had spoken to him only very briefly on this occasionhis "best recollection" was that Judge LaDart had commented that the notes were "what he had done on the case so far." He was able to recall only one other instance when Judge LaDart had simply asked about status of the motion to recuse. Finally, Judge Bodenheimer testified that it had been proper for Judge LaDart to give him anything that might have had a bearing on the motion to recuse.
The record shows that on April 7, 2000, Younce filed an Opposition to the Motion to Recuse; in this pleading, Younce argued that the Motion to Recuse was untimely because a judgment had been rendered on the merits of the case. The record does not clearly establish how Younce's attorney came by any information that Judge LaDart had come to a decision in the matter. Further, though the record is not crystal clear, it seems that at a status conference (not of record) held on this same date, Judge Bodenheimer ordered the parties to brief the issue of "when" a judgment is a judgment for the hearing on the Motion to Recuse.
At a hearing held on April 26, 2000, Judge Bodenheimer stated that he had *272 opened the sealed envelope containing Judge LaDart's papers for the first time within a few days before the hearing, and realized that the draft was a judgment on the merits. He therefore denied the Motion to Recuse based on his finding that it was not timely.
On May 31, 2000, based on PGM's writ application under docket number 00-C-1052, a panel of this Court remanded the matter of the motion to recuse, holding that because the draft judgment had not been filed into the record and served on the parties, it does not constitute a judgment for purposes of calculating the timeliness of a motion to recuse. In addition, while this Court found that allegations of improper (biased) trial conduct on Judge LaDart's part were untimely, we ordered a hearing on the allegations contained in the Motion to Recuse regarding Judge LaDart's various relationships with Beevers.
On June 13, 2000, PGM filed a Motion to Recuse Judge Bodenheimer, seeking to prevent him from hearing the Motion to Recuse Judge LaDart; Judge Martha E. Sassone ultimately granted this motion based on the finding that it was "reasonable" that Judge Bodenheimer would be called as a witness regarding the draft judgment.
The Motion to Recuse Judge LaDart was heard by Judge Alan J. Green at proceedings held August 29 and 30, 2000; the testimony outlined above was given almost entirely during these hearings. During these hearings, Judge Green granted Younce's Motion to Quash PGM's subpoenas for financial records directed to Judge LaDart based on the grounds that the requests were overly intrusive and burdensome, and that they requested information that was "not relevant" to the hearing. In addition, during the hearing, Judge Green refused to qualify an expert called by PGM, based on the judge's finding that "judicial conduct," or, "judicial obligations," are not the subjects of any recognized area of expertise.
In his oral reasons for denying PGM's Motion to Recuse, Judge Green found that
[T]here was no attempt by Judge LaDart to influence or cause a bias in favor of the plaintiff when he submitted his sealed notes to Judge Bodenheimer.
. . . .
Judge LaDart did in fact disclose prior to trial that he was friends with Mr. Beevers and this was not challenged at that time, as such, the parties were well aware of the relationships that existed.
Insofar as the allegation that Mr. Beevers was in fact representing Judge LaDart during the course of trial, I find that that representation ceased at the conclusion of the injunction proceedings during whichduring Judge LaDart's campaign. If not, it certainly ceased to exist after the election of Judge LaDart to the bench and that became a moot issue.
Finally, we note that Judge LaDart testified during the hearings that he had not seen any reason to recuse himself. He testified that he would not, without reason, "unload" a case on another judge for trial. He also testified that he had given the draft judgment to Judge Bodenheimer in an effort to be fair to everyone involved in the case. And finally, Judge Bodenheimer testified without any equivocation that no one had tried to influence his decision on the Motion to Recuse.

ASSIGNMENT OF ERROR NUMBER ONE
As PGM's first assignment of error, they argue that Judge Green was in error to deny their motion to recuse Judge LaDart. However, we see no manifest error in the *273 finding that Beevers no longer actively represented Judge LaDart during the trial of this matter. Nor do we see any error in the finding that PGM had been on notice before trial that Judge LaDart Wiley Beevers had been associated in some fashion during Judge LaDart's campaign. Finally, we see no error in various rulings regarding the admission of evidence during the recusal hearing.
A trial judge is presumed to be impartial. Couvillion v. Couvillion, 00-143, at 10 (La.App. 5 Cir. 9/26/00), 769 So.2d 747, 753, writ denied, 00-3185 (La.1/12/01), 781 So.2d 562; Tamporello v. State Farm Mut. Auto. Ins. Co., 95-458, at 6 (La.App. 5 Cir. 11/15/95), 665 So.2d 503, 506. However, the law does provide for recusal in some circumstances.
LSA-C.C.P. art. 151 holds, in pertinent part, that
B. A judge of any court, trial or appellate, may be recused when he:
(2) At the time of the hearing of any contested issue in the cause, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm), and in this case the employment shall be disclosed to each party in the cause;
. . . .
(5) Is biased, prejudiced, or interested in the cause or its outcome or biased or prejudiced toward or against the parties or the parties' attorneys to such an extent that he would be unable to conduct fair and impartial proceedings.
A party desiring to recuse a judge of a district court shall file a written motion therefore assigning the ground for recusation. This motion shall be filed prior to trial or hearing unless the party discovers the facts constituting the ground for recusation thereafter, in which event it shall be filed immediately after these facts are discovered, but prior to judgment. LSA-C.C.P. art. 154. If a party fails to file a motion to recuse after he had discovered grounds in support thereof, he has waived his rights under LSA-C.C.P. art. 151. Merritt v. Karcioglu, 95-1335, at 11-12 (La.App. 4 Cir. 1/19/96), 668 So.2d 469, 477, writ granted in part, 96-0431 (La.4/26/96), 672 So.2d 678 (on issue of damages only), 96-0454 (La.4/26/96), 672 So.2d 677 (on issue of damages only), affirmed as amended, 96-0431, 96-0454 (La.2/25/97), 687 So.2d 1002.
And finally, we note that findings made by a trial judge in motions to recuse are entitled to manifest error review. See Tamporello, 95-458 at 7, 665 So.2d at 507.
We see no error in the finding that Beevers's representation of Judge LaDart had not been ongoing during trial of this matter. Both Beevers and Judge LaDart testified that they had spoken only briefly on this issue, many months before the trial of this matter commenced. The record of the suit in question shows without question that the matter had been inactive since April 30, 1999, and we agree with the trial judge's finding that the subject matter of the suit had become moot once Judge La-Dart was elected. And though Beevers did not actually withdraw of record until after trial of this matter was in progress, we note that there are probably many, many instances in which attorneys never formally withdraw from representing parties to suits.
PGM's remaining charges of prejudice fall under section B(5) of the statute, and arise out of their allegations of professional and personal relationships between Judge LaDart and Beevers. In denying the Motion to Recuse, Judge Green found that Judge LaDart had disclosed, prior to *274 trial, that he and Beevers were friends, and that the parties to this suit were "well aware" of the relationships that existed. This finding is not manifestly erroneous.
Further, though PGM may argue that they were not informed of the extent or details of any relationship, we recall Judge LaDart's testimony that his statements regarding a friendship with Beevers had not prompted PGM's attorneys to make "any inquiry at all." In cases involving prescription issues, courts have consistently held that whenever there is notice enough to excite attention and put a person on his guard and suggest further investigation, this is tantamount to knowledge or notice of everything to which an inquiry may lead. Information or knowledge suggesting an inquiry is sufficient to start the running of prescription. Fisher v. Walgreens Louisiana Corp., Inc., 99-475, at 3 (La.App. 5 Cir. 10/13/99), 746 So.2d 161, 162; Kambitsis v. Schwegmann Giant Supermarkets, Inc., 95-478, at 4-5 (La.App. 5 Cir. 11/15/95), 665 So.2d 500, 502. We have affirmed the trial judge's finding that Judge LaDart informed all parties about the relationship he had with Beevers. Therefore, if PGM required further information regarding these relationships, they should have made inquiries as soon as they were informed that the relationships were in existence. They should have done so before trial. And had they done so before trial, their motion to recuse might have been timely filed.
Now addressing more specific arguments raised by PGM in relation to the hearing of this issue, they first argue that Judge Green was in error to quash a subpoena, directed to Judge LaDart, for "documentation" to support their claims of financial and professional dealings between Judge LaDart and Wiley Beevers. As discussed above, however, we find that the motion to recuse based on financial and professional dealings should have been filed as soon as PGM had notice of such relationships. Therefore, it is of no moment whether PGM was allowed to subpoena records for a belated recusal hearing.
Nor do we see any error in not allowing expert testimony on "judicial obligations." Judge Green was well within his discretion in not allowing this testimony. Regarding "judicial conduct," though PGM makes much of the "sealed judgment," any possible prejudice (and we stress, possible prejudice) PGM might claim has been dispelled: if PGM implies that Judge LaDart sought to prevent them from even bringing a motion to recuse, ultimately, they were allowed a full hearing on their motion. And the testimony of Judge LaDart and Judge Bodenheimer makes it clear without doubt that there were no improper "ex parte communications." We see absolutely nothing in this record to support the assertion that Judge LaDart made any effort to influence or prejudice Judge Bodenheimer in his handling of the motion to recuse.
We see no reason to disturb Judge Green's ruling on the motion to recuse Judge LaDart.

ASSIGNMENT OF ERROR NUMBER 2
In their second assignment of error, PGM asserts that the trial judge "erred in rendering final judgment awarding damages in favor of plaintiff and against PGM." PGM argues that the trial judge's findings of unseaworthiness and negligence are manifestly erroneous, and they argue that the trial judge's findings regarding medical causation and lost income are not correct. They also dispute the amount of the general damage awards made by the trial judge and the finding that Younce is entitled to attorney's fees on the maintenance and cure claim. Finally, *275 they raise several errors regarding the admission of evidence during the trial. We find no manifest error in any of the trial judge's findings or rulings.

LIABILITY AND CAUSATION

Liability
We see no manifest error in the trial judge's determination that Younce was entitled to recover under both theories of Jones Act negligence and unseaworthiness.
The Jones Act allows a seaman to sue his employer for negligence. 46 U.S.C.App. § 688; Domonter v. C.F. Bean Corp., 99-1204, at 4 (La.App. 5 Cir. 4/25/00), 761 So.2d 629, 633, writ denied, 00-1872 (La.9/29/00), 770 So.2d 354. An employer is vested with a fundamental duty to provide its seamen with a reasonably safe workplace. An employer's negligence may arise from a dangerous condition on or about the vessel, failure to use reasonable care to provide a seaman with a safe place to work, failure to inspect the vessel for hazards and any other breach of the owner's duty of care. The duty to provide a safe workplace is not absolute, but reasonable care under the circumstances sets the standard. Foster v. Destin Trading Corp., 96-0803, at 9-10 (La.6/9/97), 700 So.2d 199, 204-5 (citations omitted). The seaman need only produce "slight evidence" of causation. Domonter, 99-1204 at 5, 761 So.2d at 634; Crane v. Diamond Offshore Drilling, Inc., 99-166, at 9 (La.App. 5 Cir. 9/15/99), 743 So.2d 780, 787.
Further, the owner of a vessel has a duty to furnish a seaworthy vessel. Crane, 99-166 at 13, 743 So.2d at 789. To be seaworthy, a vessel and its appurtenances must be reasonably suited for the purpose or use for which they were intended. The owner's duty to furnish a seaworthy ship is absolute and completely independent of the duty under the Jones Act to exercise reasonable care. Liability under the doctrine of unseaworthiness does not rest upon fault or negligence. Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1354-55 (5th Cir.1988) (citations omitted). The seaman bears the burden of proving that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. Johnson, 845 F.2d at 1354; Vendetto v. Sonat Offshore Drilling Co., 97-3103, at 15 (La.1/20/99), 725 So.2d 474, 481; Crane, 99-166 at 13, 743 So.2d at 789.
In reviewing claims under both the Jones Act and the unseaworthiness doctrine, courts of appeal apply the manifest error standard. Milstead v. Diamond M Offshore, Inc., 95-2446, at 11 (La.7/2/96), 676 So.2d 89, 96; Crane, 99-166 at 6, 743 So.2d at 785. Under the manifest error standard, an appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless they are clearly wrong. Oubre v. Union Carbide Corp., 99-63, at 6 (La.App. 5 Cir. 12/15/99), 747 So.2d 212, 219. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State Through DOTD, 617 So.2d 880, 882 (La.1993). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989) (emphasis supplied; citations omitted); McCalmont v. Jefferson Parish Sheriffs Office, 99-940, at 5 (La.App. 5 Cir. 1/12/00), 748 So.2d 1286, 1289, writ denied, 00-0679 (La.4/20/00), 760 So.2d 1160.
We see no manifest error in the trial judge's findings on Jones Act negligence and unseaworthiness. We have reviewed *276 the entire, quite lengthy record in this matter, and the trial judge's findings are amply supported in the record. PGM can only argue that the trial judge's credibility calls are manifestly erroneous. However, as noted above, we are not allowed to second guess such decisions.
Finally, we see no error in the trial judge's decision to not allow PGM to introduce two exhibits into evidence in an attempt to impeach Younce's trial testimony. Younce was questioned about statements made in an April, 1996, affidavit to the effect that he had accepted a job on a ship sailing out of Rota, Spain; he was able to explain what seemed to be a contradiction between his trial testimony (that he was disabled in April of 1996) and statements made in the affidavit. The trial judge was also correct to not allow into evidence copies of answers to interrogatories filed in Younce's original federal claim. PGM sought to introduce the answers in an attempt to impeach his trial testimony regarding a 1993 accident aboard the M/V Ranger. Here, also, however, Younce was able to explain what seemed to be an inconsistency. Therefore, having reviewed the proffered documents, and finding no genuine discrepancy between them and Younce's trial testimony, and in light of the thorough questioning of Younce on the contents of the documents, we see no error.

Causation
We also see no manifest error in the trial judge's finding that the Younce's injuries were caused by the accident aboard the Sugar Islander.
A plaintiff has the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. Maranto v. Goodyear Tire & Rubber Co., 94-2603, at 3 (La.2/20/95), 650 So.2d 757, 759; Crane, 99-166 at 19, 743 So.2d at 792-3. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Wappas v. Unknown XYZ Ins. Co., 98-1380, at 6 (La. App. 5 Cir. 6/1/99), 736 So.2d 336, 339. This issue is factual and subject to the manifest error review. Crane, 99-166 at 20, 743 So.2d at 793.
We find no error in the finding that Younce's injuries were more probably than not caused by the December 31 accident. Though there is no question that Younce had suffered previous, similar injuries, these injuries had all resolved by the time Younce boarded the Sugar Islander. The only expert testimony introduced to rebut the proof of causation was the testimony of Dr. LaBorde, whose opinion was clearly compromised when he admitted that he had not reviewed all of Younce's medical records. And though PGM argues that Younce's lower back symptoms did not manifest themselves until many months after the accidentand are thus unrelatedthe medical records do show evidence of this injury as early as Younce had begun to treat with Dr. Watermeier. Having reviewed the entire record, we see no manifest error in the trial judge's finding on causation.

ERRORS REGARDING ADMISSION OF EVIDENCE
Now addressing PGM's specific allegations of error regarding the admission of evidence, we find no error in any of the trial judge's rulings.

Daubert
First, PGM argues that Dr. Watermeier's testimony on the cause of Younce's injuries is not reliable, thus inadmissible, *277 under the test announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and adopted in Louisiana in State v. Foret, 628 So.2d 1116 (La.1993).[2] PGM argues that Dr. Watermeier's opinion on causation, since it was based partly on Younce's own statements relating the injuries to his December 1995 accident, is less reliable than an opinion based solely on "objective" medical records.
During Dr. Watermeier's testimony, he was questioned thoroughly by counsel for PGM about how he formed the opinion that Younce's injuries had been caused by the Sugar Islander accident. During this questioning, it was established without question that until trial Dr. Watermeier had been unaware of some of Younce's earlier injuries, and that he had never seen the medical records relating to these injuries. However, Dr. Watermeier testified that the patient's own statements are the most reliable indicator of causation: "[A]ll the information the doctor can get regarding past history is very, very important. And whatever the patient himself can relate to the doctor I would say is more important than other medical documents.... I have to rely on everything, I have to rely on what the plaintiff tells me and the records. But .... what.... I rely on the most, I rely on what the patient tells me, all doctors do that." Further, once Dr. Watermeier had reviewed additional information regarding Younce's earlier injuries, he testified without equivocation that he had seen nothing to change his opinion relating Younce's various injuries to the Sugar Islander accident.
Dr. LaBorde, PGM's medical expert, testified that of the two factors used to determine causation, the "objective" evidence records from physical examinations is more reliable than the "subjective" evidencethe history given by the patient. Dr. LaBorde testified that while "medical causation," causation within the realm of treatment, may be based solely on the patient's history, "objective" evidence takes precedence in a determination of "forensic causation."
We agree with the trial judge's determination on this issuewe cannot agree that a treating physician's opinion on causation is so unreliable as to be inadmissible at trial. We note first that Daubert's concern is the reliability of expert's opinions based on less than "firsthand knowledge or observation." Daubert, 509 U.S. at 591, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. It has also been stated that Daubert is "concerned with determining the admissibility of new techniques." State v. Foret, 628 So.2d at 1121 (emphasis supplied). We can't see how either of these concerns implicates an opinion on the causation of injuries given by a patient's treating physician. Dr. Watermeier's testimony, that "all" doctors rely on the patient's own statements in determining causation, was not contradicted by PGM's expert. Further, the risks inherent in relying exclusively on records are revealed by Dr. LaBorde's own testimony. Dr. LaBorde's assertions that "objective" records are more reliable are called into question by Dr. LaBorde's admission that his initial opinion, rendered without all of Younce's *278 medical records, might "change" on review of additional information.
Finally, we note that LSA-C.E. art. 703 permits an expert to form an opinion based on information provided at trial. Therefore, even had there been some question about the opinion Dr. Watermeier rendered before he had seen Younce's earlier records, any possible Daubert objection was removed when Dr. Watermeier was provided with additional information during his questioning at trial and allowed to re-evaluate his original opinion.

Hearsay objections
Here, PGM argues that the trial judge was in error in admitting, over hearsay objections, an MRI report, dated April 2, 1996, and a letter from the physical therapist. We see no error.
LSA-C.E. art. 803 establishes exceptions to the hearsay rule, and states, in pertinent part that:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(4) Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.
Dr. Watermeier clearly identified the MRI as one ordered by him and used by him in his diagnosis and treatment of Younce.
Likewise, the letter from Matthew Slimming, the physical therapist, was positively identified by Slimming. Further, though the letter does not bear a date, and though Slimming could not remember when he had written it, Slimming had a recollection, at trial, of the information contained in the letter. Therefore, even if the contents of the letter were not inherently trustworthy, Slimming's trial testimony overcame any possible harm caused by its admission.

Excluded evidence
Finally, PGM complains that they were not allowed to introduce into evidence a copy of a suit filed by Younce arising out of another shipboard accident. However, we see no error in the exclusion of this document.
PGM sought to introduce a copy, during Dr. LaBorde's testimony, of another suit filed in Orleans Parish on Younce's behalf. As he was being questioned regarding Dr. Kweli Amusa's examination of Younce, questions were directed to Dr. LaBorde concerning Dr. Amusa's finding that Younce had been found fit for duty shortly before he signed on the Sugar Islander in October of 1995. However, we don't see how the fact of this other suit would have had any relevance on the issue of Dr. Amusa's findings. Dr. Amusa had examined Younce on August 3, 1995; the proffered copy of the suit indicates that Younce had been injured in an accident on August 16, 1995.

QUANTUM
PGM argues that the amounts awarded for Younce's various injuries are excessive. However, we see no manifest error in the trial judge's awards.
In the assessment of damages in cases of offenses and quasi offenses, much discretion must be left to the judge or jury. LSA-C.C. art. 2324.1. Absent a determination that the trial court's very great discretion in the award of general damages has been abused in the matter under review, the reviewing court should *279 not disturb the trier's award. Reck v. Stevens, 373 So.2d 498, 501 (La.1979), citing Wilson v. Magee, 367 So.2d 314 (La. 1979). The discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993); Mannina v. Wal-Mart Stores, Inc., 99-1102, at 12 (La.App. 5 Cir. 2/29/00), 757 So.2d 98, 106, writ denied, 00-917 (La.6/2/00), 763 So.2d 597; Stevenson v. Louisiana Patient's Compensation Fund, 97-709, at 3-4 (La.App. 5 Cir. 4/9/98), 710 So.2d 1178, 1181.
Younce was required to undergo numerous tests during his treatment, and over the course of his treatment with Dr. Watermeier, Younce underwent four serious surgeries. The surgeries to Younce's cervical and lower spine also required incisions to remove bone matter for the two grafts. Further, there is no question that Younce was still undergoing treatment as of the date of trial, with at least a possibility of future surgery. The awards made were well within the trial judge's vast discretion.

LOST WAGES
PGM argues that the trial judge was in error in awarding Younce lost income, and further, in awarding the specific sum calculated.
In awarding damages for lost income and loss of earning capacity, the trier of fact is afforded much discretion. Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979); Fleming v. Smith, 93-488, at 9 (La.App. 5 Cir. 5/31/94), 638 So.2d 467, 472.
The only evidence that Younce is employable was given by PGM's expert, who admitted that employability is contingent on Younce's having reached maximum medical improvement. Therefore, any evidence that Younce is capable of earning anything is nothing more than speculation. On the other hand, Younce himself testified that he had been unable to find any job, over the course of the years between the accident and the trial, which could accommodate his "physical" condition. Younce's treating physician has placed several limitations on Younce's ability to work, and the physical therapist and Younce's vocational rehabilitation expert both testified that these limitations make it "difficult" to find employment of any kind.
Further, though PGM disputes the trial judge's adoption of Younce's economic expert's calculation of how much income Younce has lost, PGM's own expert testified that the calculations had been done pursuant to methods acceptable within the accounting community.
Therefore, we see no abuse of discretion in the trial judge's award of lost income.

ATTORNEY'S FEES
Finally, PGM argues that the trial judge was in error in awarding maintenance and cure for injuries not related to the Sugar Islander accident, and in ordering them to pay Younce attorney's fees on the grounds that they had arbitrarily stopped maintenance and cure payments.
PGM's arguments regarding medical causation are discussed above. We repeat simply that Younce's treating physician related all of Younce's injuries, and the possibility of future treatment, to the December 31 accident. Younce is entitled to maintenance and cure until he reaches maximum medical cure.
Regarding attorney's fees, we also agree with the trial judge's determination that PGM improperly stopped the maintenance and cure payments.
The behavior necessary for such a penalty has been described as callous, recalcitrant, *280 arbitrary and capricious, or, willful, callous and persistent. Miller v. International Diving and Consulting, 95-873, at 23 (La.App. 5 Cir. 2/14/96), 669 So.2d 1246, 1260 (citations omitted). PGM cut off Younce's maintenance and cure payments, in part, based on a copy of a record entry indicating that Dr. Watermeier was considering performing surgery on Younce's lower back. In addition, the same entry, while it did indicate that Younce was doing well recovering from neck and shoulder injuries, did not state that Younce had recovered from these injuries. PGM was surely callous, if they were nothing else. The trial judge was correct to award the attorney's fees in relation to this claim.
Therefore, having found no manifest error in any of the rulings of which PGM complains, we affirm all judgments below. PGM is to bear all costs of this appeal.
AFFIRMED.
GOTHARD, J., concurring in part.
DALEY, J., dissents with reasons.
GOTHARD, J., concurring in part.
I agree with that portion of the majority opinion which finds no manifest error in the factual findings of the trial court. I respectfully concur with the decision insofar as it finds no manifest error in the denial of the Motion to Recuse Judge LaDart, although not necessarily with the reasoning stated by the majority writer.
DALEY, J., dissents with reasons:
The majority finds no error in the denial of the Motion to Recuse Judge LaDart. I respectfully disagree. I would reverse the denial of the Motion to Recuse, vacate the trial court's judgment, and remand for a new trial.
Defendants filed a Motion to Recuse Judge LaDart, alleging that he failed to disclose a personal and business relationship with attorney Wiley J. Beevers, cocounsel for plaintiff. Among other things, the motion alleged that Mr. Beevers had represented Judge LaDart in an election dispute and continued to represent him legally during at least a portion of the trial in this case. After the recusal hearing, the trial court found:
Insofar as the allegation that Mr. Beevers was in fact representing Judge LaDart during the course of the trial, I find that [the] representation ceased at the conclusion of the injunction proceedings during Judge LaDart's campaign. If not, it certainly ceased to exist after the election of Judge LaDart to the bench and that became a moot issue.
The following time line is instructive.
4/30/1999 Candidate LaDart authorizes Mr. Beevers
 to file pleadings on his behalf contesting a
 cease and desist order sought against
 LaDart by his campaign opponent
 (election suit)
5/1/1999 Judge LaDart is elected
6/24/1999 Mr. Beevers enrolls as co-counsel in Younce
 v. Pacific Gulf Marine, Inc., et al
8/25/1999 Trial begins in Younce. The trial was held
 in three sessions: August 25-28, December
 6-10, and February 22-24, 2000.
9/27/1999 Mr. Beevers formally withdraws from his
 representation of LaDart in the election
 suit.
12/6/1999 Second session of trial begins, through
 December 10.
Where a trial judge has an ongoing attorney/client relationship in an unrelated matter with an attorney who represents a party to litigation over which the judge is presiding, the judge and that attorney each have a separate and independent duty to disclose such employment relationship to all parties. The duty is mandatory. LSA-C.C.P. art. 151, subd. B(2); State Bar Articles of Incorporation, Art. 16, Rules of Prof. Conduct, Rules 1.2(a), 3.3(a)(2), 3.4(c), 8.4(f), LSA-R.S. foll. *281 37:221. Merritt v. Karcioglu, 95-1335 (La. App.1/19/96), 668 So.2d 469.
Several questions arise when the judge's attorney appears before the judge as counsel of record. If the attorney in this instance represents the judge in a pending action, the judge's impartiality may be questioned by the other party, even if the resolution of the case appears fair to the public in general. Alternatively, if an attorney appearing before the judge represented the judge only in the past, the concerns about partiality are not so acute.[1]
The time proximity of the attorney/client relationship between Mr. Beevers and Judge LaDart and Mr. Beevers's representation of Mr. Younce before Judge LaDart greatly affects the recusal question.
LSA-C.C.P. art. 151(B)(2) provides:
B. A judge of any court, trial or appellate, may be recused when he
(2) At the time of hearing of any contested issue in the case, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm), and in this case the employment shall be disclosed to each party in the cause; [Emphasis added].
Mr. Beevers, at the hearing on the Motion to Recuse, testified that he was actively involved in Judge LaDart's run-off campaign. Mr. Beevers acknowledged that he represented Candidate LaDart on April 30, 1999 when he prepared, signed, and filed an ExParte Motion to Vacate, Cease, and Desist Order in Civil Action 538-444, 24th Judicial District Court, Morgan v. LaDart. Mr. Beevers testified that he prepared the Motion to Vacate and filed it after reviewing the language of the pleading with Candidate LaDart. Mr. Beevers testified he later prepared a Motion to Withdraw as Counsel of Record some time before September 27, 1999, indicating in the motion that the legal "matter was moot." The Motion to Withdraw was filed on September 27, 1999 and an Order authorizing his withdrawal was signed on that date. Mr. Beevers's enrollment in the Younce matter was three months prior to his Motion to Withdraw in the Morgan v. LaDart matter.
In In re Cooks[2], the Louisiana Supreme Court stated that Code of Civil Procedure art. 151 B(2) mandates:
that if a judge has continued to employ [an attorney] to represent him personally who is also representing a party in a matter pending before that judge, the judge must disclose this representation to all parties in the matter pending before him. This mandatory obligation exists so that all parties will have the information necessary to determine if they should request that the judge be recused.
Judge LaDart conceded that he did not disclose to the parties in Younce that Mr. Beevers represented him as his attorney in Civil Action 538-444, 24th J.D.C.
Factors to be considered in determining the need for disqualification based on attorney/client relationships include 1) the direct degree of involvement of the attorney before the judge in the judge's case, 2) the substance of the relationship, and 3) the nature of the judge's personal case, i.e., whether personal or arising out of official duties. Mr. Beevers, based on his testimony and the testimony of co-counsel, Mr. Alfortish, was retained in the Younce *282 case because of his experience as a litigator. He was retained shortly before trial to actively participate in the trial. Mr. Beevers's involvement before Judge LaDart in the Younce case was substantial. Mr. Beevers actively participated in Judge LaDart's run off campaign and acted as Judge LaDart's legal advisor. Mr. Beevers testified that his legal engagement on behalf of Judge LaDart was very short lived. Mr. Beevers testified that his active representation of Judge LaDart lasted only one hour and fifty-nine minutes and that he did not charge Judge LaDart for his services. However, aside from the actual case involving an injunction on a campaign ad, Mr. Beevers testified that Judge LaDart visited his law office many times because Mrs. Beevers was Judge LaDart's campaign finance manager. The record also reflects that a campaign reimbursement check was issued to the law firm of Beevers and Beevers on December 5, 1999. These facts suggest that the professional relationship did not terminate immediately upon Judge LaDart's election.
The attorney-client relationship is among the most revered professional relationships in our society. The very foundation of this relationship is based upon trust and confidentiality. It would be hard to imagine that litigants, even in uncontested matters, would not be distrustful of the impartiality of a judge in a matter in which a law firm presently representing the judge was the firm of record in a matter before that judge.[3]
"If the judge chooses not to disqualify himself or herself, the judge must reveal the prior relationship with the attorney, and should seriously consider disqualification if any party objects."[4] If a judge receives free legal work from an attorney the judge risks the appearance of partiality because the public may perceive that he is trading favors with the attorney.[5]
Whether the attorney-client relationship between Beevers and LaDart was active or passive at the time that Beevers enrolled in Younce v. Pacific Gulf Marine is an important factor in determining the recusal motion. Mr. Beevers's Motion to Withdraw is a formal acknowledgment that the relationship was not active as of September 27, 1999, but this formal public acknowledgment was made after Beevers's enrollment in Younce. Mr. Beevers's enrollment in the Younce case, a bench trial before Judge LaDart, occurred within 55 days of Mr. Beevers's active representation of Judge LaDart in the 24th J.D.C. This closeness of time, coupled with the fact that the attorney/client relationship was not disclosed on the record, warrants recusal in this case.
I have reviewed the record and have found no actual evidence of bias by Judge LaDart in favor of Mr. Beevers or his client. Defendant's recusal motion was filed after the trial had been completed and the parties were awaiting a judgment. Recusal motion filed at the eleventh hour themselves appear inappropriate. Had plaintiffs counsel or the trial judge disclosed the attorney/client relationship that had existed between Beevers and LaDart before trial, then a Motion to Recuse filed after trial without clear evidence of bias would and should be summarily denied. Defendant's tardiness in this case is excusable because certain facts were not disclosed by Judge LaDart or Mr. Beevers.
*283 Our system of justice cannot operate in a climate where it appears to either party in a dispute that favoritism can cloud justice. In my view, the fair and just thing to do in this case is to vacate the judgment and retry the case eliminating even the appearance of impropriety.
Based on the foregoing, I find that the majority erred in affirming the trial court ruling denying the Motion to Recuse and the judgment of the trial court on the merits. In my view, the Motion to Recuse should have been granted, the judgment rendered in favor of Mr. Younce should be vacated and the case remanded to the district court for reallotment and a new trial.
NOTES
[1] Younce's claims had originally been filed in federal court; we assume that the federal matter was voluntarily dismissed, though this is not of record.
[2] PGM's assertions that the trial judge abandoned his "gatekeeping" role under Daubert are unavailing. The instant matter is clearly distinguishable from Caubarreaux v. E.I. duPont De Nemours, 97-978 (La.App. 3 Cir. 5/6/98), 714 So.2d 67. Here, the trial judge did issue a pre-trial ruling, affording PGM the opportunity to have taken writs. In addition, though the Daubert motion was initially denied, at trial PGM was allowed to question Dr. Watermeier and their own expert extensively about how each had formed an opinion on causation and about which is the more reliable "method."
[1] Jeffrey M. Shaman et al., JUDICIAL CONDUCT AND ETHICS at p. 133 (1995).
[2] Sup.1997, 96-1447 (La.5/20/97), 694 So.2d 892, 900, dissenting opinion 96-1447 (La.9/4/97), 697 So.2d 1326, rehearing denied, 96-1447 (La.9/5/97), 698 So.2d 953
[3] State of Florida Judicial Ethics Advisory Committee Opinion 99-13.
[4] New York Advisory Committee on Judicial Ethics, Opinion 91-10.
[5] Shaman, JUDICIAL CONDUCT, supra at p. 133.